A. Jacques LOU, Plaintiff,

v.

William BELZBERG, et al., Defendants,

Ashland Oil, Inc., Nominal Defendant.

Joan STAHL, Plaintiff,

v.

ASHLAND OIL, INC., et al.,
Defendants.

Nos. 86 Civ. 5304 (RWS), 86 Civ. 6638 (RWS).

United States District Court,
S.D. New York.

Jan. 16, 1990.

See also, 834 F.2d 730.

Milberg Weiss Bershad Specthrie & Lerach, New York City, Gene Mesh & Associates, Cincinnati, Ohio, Law Offices of David B. Gold, San Francisco, Cal. (Jerome M. Congress, Wendy K. Goidel, Patricia A. Kindel, Jacquetta M. Bardacos, of counsel), for plaintiffs.

Davis Polk & Wardwell, New York City (Richard E. Nolan, Daniel L. Brockett, James P. Rouhandeh, of counsel), for the Belzberg defendants.

Olwine, Connelly, Chase, O'Donnell & Weyher, New York City (John O'Donnell, of counsel), for defendant Ashland Oil, Inc.

Cravath, Swaine & Moore, New York City (Douglas Broadwater, of counsel), for director defendants.

SWEET, District Judge.

Defendants, William Belzberg, Hyman Belzberg, Samuel Belzberg, Marc Belzberg, First City Financial Corporation Ltd., First City Trust Company, Roxboro Investments 91976) Ltd., Bel–Fran Investments Ltd., Bel–Cal Holdings Ltd. and Bel–Alta Holdings Ltd. (collectively "First City") have moved pursuant to Federal Rule 56(c) for summary judgment, and Federal Rules 9(b) and 12(b)(6) for dismissal (the "First City Motion") of the Consolidated Amended Class Action and Shareholders' Derivative Complaint ("the Complaint"). Defendant Ashland Oil, Inc. ("Ashland"), and defendants John R. Hall, Robert T. McCowan, William R. Seaton, Charles J. Luellen, Samuel C. Butler, Eugene W. Erickson, James B. Ferley, Robert D. Gordon, Jr., Walter W. Hillenmeyer, Jr., Don T. McKone, Harold S. Mohler, Grover E. Murray, Jane C. Pfeiffer, Robert S. Reigeluth, James R. Rinehart, F.H. Ross, Jr., Robert B. Stobaugh, Richard L. Terrell, and James W. Vandeveer (the "Directors") have also moved (the "Ashland Motion") pursuant to Federal Rule 12(b)(6) for dismissal of the derivative claims contained in the Consol-idated Amended Complaint. For the reasons set forth below, these motions are granted in part and denied in part as set forth below.

*Parties*

Plaintiff A. Jacques Lou ("Lou") bought 1,000 shares of Ashland common stock on March 27, 1986. Lou was a shareholder of Ashland at the time the transactions complained of herein took place and continues to hold shares of Ashland common stock.

Plaintiff Joan Stahl ("Stahl") was the owner of Ashland's common stock (in her representative capacity as Custodian for Danielle Stahl) during the time of the challenged transaction and she continues to hold Ashland shares.

The First City defendants, include certain members of the Belzberg family and the companies they control as listed above. First City is an investment corporation with financial, manufacturing, and real estate subsidiaries in the United States and Canada.

The Ashland defendants ("Ashland"), include members of the Board of Directors, listed above, and Ashland, as the nominal defendant in the derivative claims. Ashland is a corporation organized and existing under the laws of the Commonwealth of Kentucky.

*Prior Proceedings*

Stahl initially filed an action (the "Stahl Action") in the Eastern District of Kentucky on April 14, 1986. On the same date, Lou filed an amended complaint ("Lou Action") in California State Court. After protracted litigation in California bearing on whether the claims were properly in a federal court, on May 12, 1986, First City, Ashland Oil, and Drexel moved to change venue of the Lou Action pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the Southern District of New York. By order of May 14, 1986 the motion to transfer was granted. On May 22, 1986 Ashland moved to transfer the Stahl Action to the United States District Court for the Southern District of New York and by order of August 8, 1986 the motion was granted. On October 18, 1988

the Amended Consolidated Complaint (the "Complaint") combining both the Lou and Stahl Actions was filed. On March 16, 1989 Ashland moved to dismiss the derivative claims in the complaint and on March 17, 1989 First City moved for dismissal and Summary Judgment. Oral Argument on both motions was heard on October 20, 1989, and the motions were considered fully submitted as of that date.

*Facts*

First City began purchasing Ashland stock in February of 1986. Between February 11, and March 25, First City acquired approximately 1.4 million shares of Ashland common stock as well as options to purchase an additional 1.2 million shares.

On March 24, 1986, First City informed Ashland that First City had accumulated between 8% and 9% of Ashland stock and that First City was filing a Schedule 13D with respect to these purchases. First City proposed a meeting between Samuel Belzberg and Ashland's Chairman, defendant John R. Hall ("Hall"), with respect to a possible transaction involving Ashland. The next day, Ashland issued a press release announcing First City's holdings, resulting in a rise in the market price of Ashland shares.

Also on March 25, Samuel Belzberg sent a letter to Hall stating:

Based on our study of publicly available information concerning Ashland and our analysis of its business and prospects, we are prepared today to enter into an agreement providing for the acquisition of 100% of the stock of Ashland by First City at a price of $60.00 per share of common stock. If you enter into good faith negotiations with us, we believe that working together we can negotiate a higher price for Ashland's stockholders. If you reject out proposal and our offer to negotiate we will consider all available alternatives.

The closing price of Ashland's stock on March 25, 1986 was $52 per share, an increase of $3.75 per share from the previous day.

On the morning of March 26, a representative of Ashland telephoned a representative of First City, stating that, while Ashland was not interested in discussing any transaction with First City, Ashland was mindful of its duties to its stockholders. The Ashland representative further reported that Hall was not interested in meeting the week of March 25, as had been requested and suggested the possibility of a meeting at the end the week of March 31.

On the afternoon of March 26, First City filed its Schedule 13D, disclosing that First City had acquired 9.2% of Ashland's common stock. First City also stated that, had the requested meeting taken place, First City intended to propose, subject to the approval of Ashland's Board of Directors, the acquisition of Ashland by First City at a price of $60 per share. A copy of Samuel Belzberg's letter to Hall was attached as an exhibit to the Schedule 13D.

The Schedule 13D also disclosed that First City was considering a number of available options with respect to its future course of action:

First City's future course of conduct will depend upon the receptivity of the management and Board of Directors of the Issuer, the availability of other opportunities for the use of the resources of First City, market conditions and other relevant developments.... Pending a determination by First City as to its future course of conduct with respect to the Issuer, it may increase or decrease or continue to hold or to dispose of its position in the Issuer and may seek to obtain representation on the Issuer's board of directors.

On March 27, First City filed a Hart–Scott–Rodino Notification and Report Form with the Federal Trade Commission and the Department of Justice seeking antitrust clearance to acquire more than 50% of Ashland's stock.

Following First City's proposal, Ashland began intensive efforts to encourage passage of and ultimately obtained "anti-takeover" legislation in Kentucky which severely restricted the ability of Kentucky corporations, such as Ashland, to effect mergers or other business combinations by an acquiror for a period of five years when such a

combination had not been approved in advance by the company's board of directors. After securing the passage of this legislation Ashland informed First City that Ashland would not, under any circumstances, enter into good faith negotiations with respect to First City's proposal. Ashland also stated that, if required, Ashland would take whatever additional actions were necessary to ensure its independence.

On March 31, 1986, Ashland's financial advisor, First Boston, proposed to First City's financial advisor, Drexel Burnham, that Ashland purchase the shares held by First City. After discussions, First City agreed to sell its stock to Ashland at a price of $51 per share (the "Agreement"). This price was $.50 per share less than the price of Ashland common stock at the close of the market on March 31.

First City agreed to sell its shares to Ashland, and Ashland undertook to provide value to all shareholders. A representative of Ashland stated that management would recommend to the Ashland Board that Ashland purchase, apart from First City's shares, an additional fifteen to twenty percent of Ashland's common stock from other stockholders in the open market. In addition, First City agreed to a standstill arrangement, under which it promised not to acquire any voting shares of Ashland for a period of ten years, and Ashland released First City from any liability arising out of the stock purchase transaction.

The Ashland Board approved the Agreement and stated the following reasons in the minutes of the Board meeting:

(1) That the Corporation and its shareholders would be better served by remaining independent than by having the Corporation acquired at a price of $60 per share. In reaching this conclusion, the Board considered the Corporation's business as a whole (including, among other things, management's own internal evaluations and outside advice indicating that a price of $60 for the Corporation's Common Stock did not reflect the full value of the Corporation), the Corporation's financial position, its borrowing capacity, the replacement cost of its fixed

asets [sic] and inventories, and its future prospects. In addition, the Board noted that a $60 price was below the value which many investment analysts have publicly given to the Corporation's Common Stock.

(2) That this is an imprudent time for the Corporation to be acquired. In reaching this conclusion, the Board considered factors referred to above, as well as general economic conditions and current conditions in the petroleum exploration, production, marketing and refining industries, both in the United States and worldwide.

(3) That in addition to the above factors as well as the First City Parties' past record, the Board strongly believed that it was in the long-term interests of the shareholders to repurchase the First City Parties' shares at this time. Any continuation of or increase in the First City Parties' investment was also felt likely to have a disruptive effect on the customers and employees of the Corporation.

On April 2, 1986, the Agreement was consummated in New York. The terms of the Agreement, as well as the background of its negotiation, were disclosed in an amendment to First City's Schedule 13D filed with the SEC on April 2, 1986. That same day, Ashland announced a major restructuring pursuant to which it would purchase 7.5 million shares of its stock on the open market and transfer an additional 5.3 million shares to an employee stock ownership plan (ESOP).

After the Agreement was announced the price of Ashland stock on the New York Stock Exchange dipped to $49¾ per share on April 1. With the exception of the nine days following the October 1987 stock market crash, Ashland stock has traded for more than $51 per share continuously since late April 1986. Adjusted for a two-to-one stock split effected last July, Ashland stock, at the filing of these motions, was trading for more than $70 per share.

Within two weeks of the announcement of the disputed stock transaction, Ashland was sued in both the Lou Action and the Stahl Action. Neither Lou nor Stahl made

any demand on the Ashland Board prior to filing their complaints. Each alleged that she was excused from this requirement because any such effort would have been futile and continued such allegations at the time of the second consolidated amended complaint. Ashland and the Directors answered the Stahl and Lou Action complaints on October 7, 1986 and March 31, 1988 respectively, denying, *inter alia*, their allegations of demand futility.

*The Motions*

Lou's claims, brought individually and on a derivative basis, allege violations of Sections 10(b) and 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) & 78m(d) and Rule 10b–5, Sections 1962(a), (c) and (d) of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 ("RICO"), and the common law of fiduciary duty and fraud. Of the four derivative claims asserted by Lou on Ashland's behalf, two—those alleging violations of Section 10(b) of the 1934 Act and RICO—are asserted only against First City. The two remaining derivative claims, for "Breach of Fiduciary Duty" and "Waste and Usurpation of Corporate Assets," are asserted against both First City and Ashland.

Ashland moves to dismiss the derivative claims contained in the Complaint for failure to make a demand on Ashland's Board of Directors pursuant to Fed.R.Civ.P. 23.1.

First City moves pursuant to Federal Rule 56(c), for summary judgment in favor of First City on the derivative and individual claims brought under Section 10(b) and Rule 10b–5 on the ground that First City's disclosures in its Schedule 13D were sufficient as a matter of law and that neither the Ashland Directors nor any reasonable investor could have been misled; pursuant to Federal Rule 9(b), to dismiss the Section 10(b) and Rule 10b–5 claims for failure to plead fraud with particularity; pursuant to Federal Rule 56(c), for summary judgment for First City on the common law fraud claim on the ground that First City's disclosures in its Schedule 13D were sufficient as a matter of law and that no reasonable investor could have been misled; pursuant to Federal Rule 9(b), dismissing the common law fraud claim for failure to plead fraud with particularity; pursuant to Federal Rule 56(c), for summary judgment in favor of First City on the derivative claims as against First City on the ground that the claims are precluded by the release given by Ashland to First City as part of the Agreement; pursuant to Federal Rule 23.1 to dismiss the derivative claims as against First City for failure to make a pre-suit demand on the Ashland Board of Directors; pursuant to Federal Rule 12(b)(6) to dismiss the aiding and abetting breach of fiduciary duty and corporate waste claims for failure to state a claim upon which relief may be granted; pursuant to Federal Rule 12(b)(6) to dismiss the individual and derivative claims brought under RICO for failure to state a claim upon which relief can be granted insofar as the claims are based on predicate acts of Section 13D and Hart–Scott–Rodino reporting violations; pursuant to Federal Rule 56(c) to grant summary judgment to First City on the individual and derivative RICO claims insofar as they are based on violations of Section 10(b) on the ground that there is no genuine issue of fact with respect to whether First City committed the alleged Section 10(b) predicate offenses; pursuant to Federal Rule 9(b) to dismiss the individual and derivative claims for failure to allege fraud with particularity with respect to each of the underlying predicate offenses; pursuant to Federal Rule 12(b)(6) to dismiss the individual and derivative RICO claims for failure to allege certain additional essential elements of a RICO claim.

## 1. Legal standards governing motions

### A. Motion to Dismiss

On a motion to dismiss under Rule 12(b)(6), the factual allegations of the Complaint are construed in the light most favorable to the plaintiff and are presumed to be true. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Meyer v. Oppenheimer Management Corp.*, 764 F.2d 76, 79 (2d Cir.1985). The court should not dismiss the complaint

unless it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). *Accord, Hishon v. King & Spaulding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984), *quoted in H.J. Inc. v. Northwestern Bell Tel. Co.,* — U.S. —, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989).

### B. Summary Judgment

To grant summary judgment the court must determine that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The court's responsibility is not to resolve disputed issues of fact, *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987), but to determine whether there are any factual issues to be tried, while resolving ambiguities and drawing inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)). Summary judgment enables the court to dispose of meritless claims before becoming entrenched in a frivolous and costly trial. *Donahue*, 834 F.2d at 58, (citing *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)).

### C. Rule 9(b)

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R.Civ.P. Rule 9(b). Although Rule 9(b) allows intent to be pleaded generally, the complaint must allege facts sufficient to support an inference of fraudulent intent. "[C]ircumstances must be pleaded that provide a factual foundation for otherwise conclusory allegations of scienter." *Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1004 (2d Cir.1988) (reports of other occasions of alleged greenmail activity and conclusory suspicions as to motives do not suffice), *cert. denied,* — U.S. —, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988).

### 2. The Ashland Motion

■ Rule 23.1 of the Federal[1] Rules of Civil Procedure provides in pertinent part:

In a derivative action, ... the complaint shall allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or the reasons for his failure to obtain the action or for not making the effort....

The rule is founded upon long supported policy considerations which recognize that "the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors or the majority of shareholders." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 530, 104 S.Ct. 831, 835, 78 L.Ed.2d 645 (1984). *Accord Lewis v. Graves*, 701 F.2d 245, 247 (2d Cir.1983); *Elfenbein v. Gulf & Western Indus.*, 590 F.2d 445, 450 (2d Cir.1978); *Brody v. Chemical Bank*, 517 F.2d 932, 934 (2d Cir.1975).

A failure to make a demand can be excused only in "exceptional" circumstances, *In re Kauffman Mutual Fund Actions*, 479 F.2d 257, 263 (1st Cir.) *cert. denied*, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973) such that any demand would be "futile," "useless," or "unavailing." *Kaster v. Modification Sys., Inc.*, 731 F.2d 1014, 1017 (2d Cir.1984) (citing *Cathedral Estates v. Taft Realty Corp.*, 228 F.2d 85, 88 (2d Cir.1955) (citations omitted)). "The doctrine of demand futility," however, "stands as an exception to the general rule of demand." *In re E.F. Hutton Banking Prac-*

---

**1.** For the purposes of this discussion we need not reach the question of whether the necessity of demand upon directors is a matter of federal procedure, governed by federal law, or a matter of the applicable substantive law because the requirements of demand upon directors under Fed.R.Civ.P. 23.1 and Kentucky law are essentially identical. *See, e.g., Security Trust Co. v. Dabney*, 372 S.W.2d 401, 403, 405 n. 3 (Ky.1963).

*tices Litig.,* 634 F.Supp. 265, 269 (S.D.N.Y. 1986). Reasons for a claim of futility must be supported in the complaint by "particularized allegations of bias or self-interest on the part of the ... directors." *Lewis,* 701 F.2d at 249.

"[T]he decision as to whether a plaintiff's allegations of futility are sufficient to excuse demand depends on the particular facts of each case and lies within the discretion of the district court." *Id.,* at 248 (citations omitted). The motion to dismiss the claim for failure to make a demand on the ground of futility must be granted if it appears from the complaint that Lou can prove no set of facts to support the contention that the demand would be futile.

The complaint alleges several grounds upon which Lou deemed that a demand on Ashland would be futile and to which Ashland disputes. Each allegation is addressed in turn.

Lou alleges that the Ashland directors both approved the buyout of First City and promised explicitly not to do or pursue them in connection with any of the wrongs alleged in the suit. Lou contends that the unlawful nature of the Agreement strongly suggests that the directors were not capable of evaluating the merits of the actions objectively and that once committed to the Agreement the directors were "incapable of exercising independent objective judgment in deciding whether to bring this action" against the directors or First City. Additionally, Lou alleges that all of the Ashland directors actively participated in, approved of, or committed the wrongs alleged and that in order to bring suits against the wrongs, the directors would have to sue themselves, an undertaking in which they will not engage. Lou alleges that the directors are interested in the transactions complained of and were aiming, among other thing to prevent control of Ashland from passing in to the hands of others. Lou alleges that the Directors know of the alleged wrongs underlying the present claim and have publicly endorsed and defended these actions.

Lou contends that where the directors are "antagonistic, adversely interested, or involved in the transaction attacked, a demand is *presumptively* futile, and need not be made." *See Cathedral Estates, Inc.,* 228 F.2d at 88. Nonetheless, it is well settled that mere prior approval or acquiescence in a challenged transaction does not excuse the failure to make a demand. *Lewis,* 701 F.2d at 248; *Grossman v. Johnson,* 674 F.2d 115, 124 (1st Cir.), *cert. denied,* 459 U.S. 838, 103 S.Ct. 85, 74 L.Ed.2d 80 (1982); *Greenspun v. Del E. Webb Corp.,* 634 F.2d 1204, 1210 (9th Cir.1980). As the Second Circuit has explained:

> the fact that a corporation's directors have previously approved transactions subsequently challenged in a derivative suit does not inevitably lead to the conclusion that those directors, bound by their fiduciary obligations to the corporation, will refuse to take up the suit. *Lewis,* 701 F.2d at 248.

The Court noted that, because "[d]erivative suits are almost invariably directed at major, allegedly illegal, corporate transactions", to hold otherwise would "substantially dilute[ ]" the effectiveness of Rule 23.1. *Id.* Similarly, *Lewis,* rejects the argument that a demand is futile because to bring a suit on the present claims the Directors would have to sue themselves. *Id.* at 249 (demand not excused on the basis that plaintiff named as defendants more than a majority of [the] corporation's then serving directors).

Moreover, these allegations that the demand would have been futile are insufficient in that they relate to the Directors at the time of the transaction, not to the set of Directors at the time of the filing of the amended complaint. *Brody v. Chemical Bank,* 517 F.2d 932, 934 (2d Cir.1975) *aff'g* 66 F.R.D. 87, 89 (S.D.N.Y.1974) ("[T]he facts pleaded by plaintiff should have related to and supported an allegation of futility of making a demand on the board of directors of [defendant] *as constituted on the date of the filing of the second amended complaint*") (emphasis in original).

The membership of the Ashland Board has changed since the transaction complained of and the filing of the initial complaint. Seven of the Directors have retired

from Ashland's Board and one has died. Another retired after the filing of the amended complaint. The present Ashland Board includes five directors who have taken office since the complained of transaction. To deprive the newly constituted Board the opportunity to decide whether Ashland would best be served by instituting its own suit on behalf of the majority of shareholders is to ignore the policy considerations behind Rule 23.1. It is no retort to allege that because the now-existing Directors have taken no "corrective action" that this conduct precludes the requirement to make a demand. *Lewis,* 701 F.2d at 249 ("bald charges of mere failure to take corrective action are similarly inadequate to demonstrate futility"). To assert such requires an assessment that the current Board has failed to exercise its valid business judgment, a wholly conclusory allegation absent some set of facts upon which to premise this conclusion.

Lou attempts to allege these facts. Lou contends that the Ashland directors were primarily motivated by a desire to protect their personal positions such that any demand would prove futile. Lou maintains that various actions support this allegation of bias and entrenchment. Specifically, Lou contends that the Directors's pursuit of antitakeover legislation was motivated not merely to prevent the hostile takeover, but also to avoid the inconvenience of a major shareholder closely scrutinizing, criticizing, and potentially challenging the actions of management, including prior wrongdoings. Additionally, the complaint alleges that the 5.3 million shares issued by the Directors to an Ashland ESOP make is virtually impossible for anyone who desired to acquire Ashland to obtain enough stock to do so. Lou alleges that "the transactions complained of ... were designed ... to entrench the directors in their positions of power, prestige and profit."

Lou's assertion of an entrenchment motive does not meet the legal or factual burden imposed by Rule 23.1. The various allegations made to support entrench-

ment—prior misconduct, the passage of legislation, the ESOP—are insufficient given the change in the board since the challenged transaction and the allegations used to support the claim of entrenchment. *See Lewis,* 701 F.2d at 249, 250 & n. 3 (plaintiff must show "logical and factual nexus between the transaction and the asserted entrenchment"). Since one-third of the Ashland board has retired since the actions which are the subject of the complaint, the contention of futility on the basis of entrenchment or self-bias requires the allegation of additional facts to support conclusory allegations of bias on behalf of the current Directors and the contention of futility.

Lou contends that this set of allegations presents "a classic situation where demand is deemed futile and not a precondition to the maintenance of a derivative action under Rule 23.1," Plaintiff Brief at 61, and that the situation is identical to that found in the case of *Samuel M. Feinberg Testamentary Trust v. Carter,* 652 F.Supp. 1066 (S.D.N.Y.1987). *Carter,* involved a derivative action against director defendants who allegedly repurchased shares of corporate stock to prevent a hostile takeover and to thereby secure continued possession of their positions. In *Carter,* director defendants negotiated, substantially participated in, and were aware of the wrongs underlying the securities fraud claims at issue. The *Carter* Court found that the defendant directors's adverse interest created by their manifest desire to "retain their position" rendered a demand on them futile. *Carter,* 652 F.Supp. at 1069. *Carter,* according to Lou, stands for the proposition that defendants could not rebut the Rule 23.1 presumption that the challenged "greenmail payment" transaction was motivated by corporate management's self-interest by the mere assertion that the transaction was not completely undirected to a corporate purpose. *See id.* at 1075.

The situation in *Carter,* however, is factually distinct from the present case.[2] In

---

**2.** *Carter* has been considered against the growing trend for courts to excuse demand in fewer instances. *See* S. Savett, *The Derivative Action:* *Is the Shareholder's Vehicle for Insuring Corporate Accountability in Jeopardy,* PLI Securities Litigation 1989, 449, 478 (August 14, 1989).

*Carter,* the directors secretly had repurchased stock for $7 *above* the market price, had extracted a promise of silence from the seller, and had thereafter "followed a continued policy of refusing to discuss or misrepresenting the transaction" to its own shareholder. *Id.* at 1074. Here, Ashland's Directors repurchased the stock at *below* the market price level and immediately and publicly announced the acquisition. Unlike *Carter,* the present case is not an "atypical situation where the self-interest of corporate directors may well have dominated other considerations." *Id.* at 1075.

Plaintiffs have failed to comply with Rule 23.1 and have provided no binding, on point, authority for why the allegations made should be deemed to satisfy the failure to make a demand on the ground that it is futile. No set of facts alleged in the complaint, even when taken as true, can support the allegation that a demand on the Board at the time of the second amended complaint would have been futile. Given the underlying policy considerations and the seriousness with which this Circuit views the demand requirement, Ashland's Rule 12(b)(6) motion is granted.

### 3. The Derivative Claims

■ Lou's failure to make a demand as required by Rule 23.1 on the Ashland Board raises the question of whether First City, against whom Lou asserts the four derivative claims on behalf of Ashland, has standing to seek dismissal based on Lou's failure to plead futility of demand as required by Rule 23.1. Lou does not contest this point, and although there is contrary authority, the weight of case law supports the standing of third parties to seek dismissal based on a plaintiff's failure to plead futility of demand as required by Rule 23.1. *See, e.g., Kaplan v. Peat, Marwick, Mitchell & Co.,* 540 A.2d 726, 730 (Del.1988). *Accord, Shlensky v. Dorsey,* 574 F.2d 131,

142 (3d Cir.1978); *Weiss v. Temporary Inv. Fund, Inc.,* 516 F.Supp. 665, 667 n. 4 (D.Del.1981), *reh'g denied,* 520 F.Supp. 1098 (D.Del.1981), *aff'd,* 692 F.2d 928 (3d Cir.1982), *vacated on other grounds,* 465 U.S. 1001, 104 S.Ct. 989, 79 L.Ed.2d 224 (1984), *on remand,* 730 F.2d 939 (3d Cir. 1984). *But cf. Markowitz v. Brody,* 90 F.R.D. 542, 561, & n. 19 (S.D.N.Y.1981) (demand defense available only to fiduciaries of derivative corporation and not "strangers," but noting that principle that "only the part[ies] for whose benefits a defense is intended" may raise the defense may not hold where considerations of public policy primarily informed defense).

The demand requirement of Rule 23.1 is necessary and appropriate where, as here, claims of fraud and racketeering against third parties are sought to be asserted derivatively on behalf of a corporation with respect to a transaction entered into by the corporation's directors, who necessarily have superior knowledge of the facts and circumstances of the underlying events. *See Lewis v. Graves,* 701 F.2d at 248. This is particularly true where, as here, no facts are alleged to justify excusing demand by reasons of any relationship between First City and the Ashland Board which would indicate a predisposition beyond the Agreement itself not to prosecute claims against First City if the facts and circumstances were to justify such action.

Thus, before such derivative litigation is permitted to go forward and before the corporation should be exposed to financial responsibility for the litigation, the Directors should be required to determine whether the litigation was proper and in the best interest for the corporation unless some facts are alleged beyond the action adopted which gives rise to the claim.[3] Because First City is permitted to raise the defense of demand against the derivative claims, we do not reach the question of

---

**3.** Although Lou does not seek recision of the transaction because of the current success of Ashland stock, this argument rings especially true where some shareholders would be seeking recision of the transaction or restoration when such a course of conduct would not be in the best interest of the corporation and its share-

holders. *See e.g., Fischel & Bradley, The Role of Liability Rules and the Derivative Suit in Corporate Law: A Theoretical and Empirical Anaylsis,* [sic] 71 Cornell L.Rev. 261, 271–72 (discussing the potential risks and "perverse incentives" sometimes associated with derivative suits).

whether the Agreement prevents the derivative claims.

### 4. First City Motion to Dismiss and for Summary Judgment

#### A. Section 10(b) and Rule 10b–5 Claims

■ Section 10(b) of the 1934 Act and Rule 10b–5 are designed to prohibit fraud or manipulation in connection with the purchase or sale of a security. To state a claim under Section 10(b) and Rule 10b–5 a plaintiff must allege that the defendant made a material misstatement or omitted to disclose a material fact. *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir.1986); *See, e.g., Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir. 1985). It is beyond dispute that a plaintiff must demonstrate that the defendant acted with scienter for liability to exist. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 201, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976). In the Second Circuit, a defendant's reckless conduct will satisfy the scienter standard. *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 46 (2d Cir.1978), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978).

Lou alleges that the representations in the 13D and in the March 25, 1986 letter attached to the 13D were materially false and misleading as, at the time they were made, the Belzberg Group did not intend to acquire 100% of the stock of Ashland but, instead, intended to extract a greenmail payment. First City contends that the disclosures were true and complete in all respects and that nothing in these disclosures, either affirmatively or by omission, could be held as a matter of law to have been false or misleading concerning the plans of First City.

Schedule 13D is designed to protect shareholders and potential investors from making informed investment decisions. Consequently, to state a claim under rule 10b–5 the alleged nondisclosure must constitute information required to be disclosed in Schedule 13D and must be material to a reasonable investor. *TSC Indus., Inc. v.*

*Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

Schedule 13D statements which disclose the possibilities the reporting person is considering, but which do not indicate a commitment to any particular course of action have been upheld as proper disclosures against allegations of allegedly undisclosed "greenmail" intentions. For example, in *Chock Full O'Nuts Corp. v. Finkelstein*, 548 F.Supp. 212, 218 (S.D.N.Y.1982), plaintiffs alleged that defendants insurgent shareholders who sold their shares to the issuer at a premium to end a proxy fight, violated Section 13D by failing to disclose that their true purpose was not to gain control but to obtain a premium for their shares. In dismissing the complaint, the Court held that the Schedule 13D adequately disclosed the various alternatives which the defendant might choose:

> [T]hese 13D Statements reasonably convey[ed] the possibility that [the defendants might sell their shares], and this reality of life is so obvious that any reasonable investor reading the Statement would realize that if offered a sufficient price ... [the defendants] will sell.

The possibility that First City might sell its shares at a profit to Ashland or a third party was an "obvious conclusion," an "implicit assumption," and a "self-evident" fact that need not have been stated. *Management Assistance Inc. v. Edelman*, 584 F.Supp. 1021, 1027 (S.D.N.Y.1984). *See also Pantry Pride, Inc. v. Rooney*, 598 F.Supp. 891, 901 (S.D.N.Y.1984) (disclosure of possibilities of future scenarios sufficient). To date there is no 13D requirement that First City would have to disclose a potential outcome, in pejorative terms, such as "greenmail." *See, e.g., Data Probe Acquisition Corp. v. Datatab, Inc.*, 722 F.2d 1, 5–6 (2d Cir.1983) (the required disclosure is not a "rite of confession or exercise in common law pleading. What is required is the disclosure of material objective factual matters"), *cert. denied*, 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984).

First City complied with the disclosure requirements of Schedule 13D as a matter of law in the following respects: First City stated that it had acquired 9.2% of Ashland shares, which was true; it stated that it intended to propose an acquisition of Ashland at $60 per share, as in fact it did in Samuel Belzberg's letter to Hall; it stated that First City might increase or decrease its holdings; and it stated that it might dispose of its shares entirely at any time. As a matter of law, First City made no misrepresentation or material omission with respect to these issues and thus to the extent that Lou's contentions are based on these facts evidencing a "geenmail" motive, First City's motion for summary judgment is granted.

■ Lou's contentions, however, do not only center on the statements made in the 13D disclosure but rather on what Lou claims to have been an implicit assumption within the 13D disclosure, namely that First City had the financing and potential to acquire Ashland. Lou contends that "implicit" in First City's disclosure were (1) "a representation that [First City] had a reasonable ground for belief that [it] could obtain financing for $60 per share on a basis that would be acceptable to [it]"; and (2) "a representation that financing for $60 per share could be arranged even if the Ashland directors refused to cooperate with First City."

Lou's contentions are based on the March 25 First City letter to Ashland that stated, *inter alia*, that:

Based on our study of publicly available information concerning Ashland and our analysis of its business and prospects, we are prepared today to enter into an agreement providing for the acquisition of 100% of the stock of Ashland by First City at a price of $60 per share of common stock. If you enter into good faith negotiations with us, we believe that working together we can negotiate a higher price for Ashland's stockholders.

Lou contends that implicit in the letter was a representation that First City had a reasonable ground for believing that they could obtain financing for $60 a share on a

basis that would be acceptable to them. This representation appears explicitly in the 13D which states:

First City believes that it would be able to obtain, from a combination of its own resources and borrowing, sufficient funds for any such transaction, although it has no specific commitments for any such borrowings.

Lou contends that implicit in the reading of these two passages was a representation that financing for $60 per share could be arranged even if the Ashland directors refused to cooperate with First City because the letter stated that a higher price could be obtained if the transaction could be done on a friendly basis. Lou contends in its brief, and after benefit of discovery, that these representations regarding First City's ability to finance were either intentionally false or were made in willful disregard of their truth.

On a motion for summary judgment the court will consider all pleadings and documents before the court. The questions before the court on this summary judgment motion are whether as a matter of law no reasonable investor could have been misled to believe that First City was not prepared to propose an acquisition and whether there is any triable issue of fact as to whether First City did mislead or misrepresent its ability to acquire Ashland.

First City contends that at as a matter of law no reasonable investor could have been misled by the 13D because of the explicit statement that First City did not have its financing secured at the time. In support of this refutation, First City cites as analogous various cases that indicate no particular level of financing commitment need be settled at the time of a tender offer. *See e.g., IU Int'l Corp. v. NX Acquisition Corp.,* 840 F.2d 220, 224 (4th Cir.1988). Accepting the analogy, we still find this answer to be insufficient.

The issue here is whether the investing public was fully informed that First City's acquisition proposal was subject to its ability to arrange financing. Lou contends that implicit in the 13D disclosure was the statement that First City was prepared at that

time to buy 100% of the stock and could obtain financing to do so—whether the takeover was hostile or not—for at least $60 per share. Two questions of triable fact are thus present: (1) whether the letter and 13D statements when read together could have misled a reasonable investor about First City's level of preparedness to finance a buyout of Ashland and (2) whether First City intended to misrepresent its potential for financial preparedness at the time the statements were made.

Although both of these related issues could defeat a motion for summary judgment, Lou's Section 10(b) and Rule 10b–5 claims must be dismissed under Rule 9(b).

### B. 9(b) Pleading Requirements with respect to 10b Claims

Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The Second Circuit recently described three aims served by Rule 9(b):

> (1) providing a defendant fair notice of plaintiff's claim, to enable preparation of defense; (2) protecting a defendant from harm to his reputation or goodwill; and (3) reducing the number of strike suits.

*DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987). Particularly in securities fraud litigation, Rule 9(b) reduces the possibility that conclusory complaints will enable a plaintiff to engage in lengthy and costly discovery, "with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence...." *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978).

Rule 9(b), however, permits a litigant to plead intent generally, as long as the complaint alleges facts sufficient to support an inference of fraudulent intent. *See, e.g., Stern*, 844 F.2d at 1003; *Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir.1972). Nonetheless, "[t]he 'mere assertion that wrongful statements were made, without more, is wholly insufficient to support a claim of fraud.'" *Zuckerman v. Harnischfeger Corp.*, 591 F.Supp. 112, 117 (S.D.N.Y.1984), (quoting *Juster v. Rothschild, Unterberg, Towbin*, 554 F.Supp. 331, 334 (S.D.N.Y. 1983). Moreover, when more than one defendant is charged with fraud, the complaint must particularize each defendant's alleged participation in the fraud. *Leslie v. Minson*, 679 F.Supp. 280, 284 (S.D.N.Y. 1988).

Under these standards, Lou's complaint fails in that it states nothing beyond conclusory allegations that First City "did not intend to acquire Ashland," but instead "intended to extract a greenmail payment." As discussed fully above, under these circumstances, an alleged greenmail motive does not constitute a 10(b) claim. Instead, it is Lou's contention that First City misrepresented its financial preparedness that survives the motion for summary judgment and dismissal.

Lou, however, does not allege this or any supporting facts about First City's lack of financing and their alleged intent to misrepresent their financial preparedness to acquire Ashland in the complaint. Neither greenmail motive nor the failure of the buyout to occur can suffice as allegations supporting the misrepresentation of preparedness. *See e.g., Brayton v. Ostrau*, 561 F.Supp. 156, 163 (S.D.N.Y.1983). Allegations of a greenmail motive are distinct from allegations of a misrepresentation of financial preparedness—even though the latter may support the former, the former, as a matter of law, is not a 10(b) violation while the latter may be. Consequently, misrepresentation as to First City's financial preparedness and the potential ability of a reasonable investor to have understood the 13D as indicating this financial preparedness must be pleaded in the complaint with facts supporting the allegations.

Here, it appears that Lou has changed the theory of her case between the filing of the second amended complaint and the filing of her brief in opposition to First City's motions. Consequently, although Lou may have a valid allegation of misrepresentation constituting a Section 10(b) violation, Lou has failed to plead the allegation sufficient-

ly, the facts supporting the allegation, and the nature of each defendant's role in the misrepresentation. Accordingly, the Section 10(b) and Rule 10b–5 claims are dismissed with leave to amend for failure to comply with Rule 9(b).

### C. Common Law Fraud

■ Common law fraud claims, like claims under Section 10(b) and Rule 10b–5, require a plaintiff to plead and prove misrepresentation and reliance. *See, e.g., Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80 (2d Cir.1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981). Common law fraud claims are similarly subject to Rule 9(b). *E.g., Perma Research and Dev. Co. v. Singer Co.,* 410 F.2d 572, 576 (2d Cir.1969). Accordingly, Lou's common law fraud claim suffers from the same defects outline above and is therefore dismissed.

### 5. Aiding and Abetting Claims

■ The Amended Complaint charges First City with secondary liability under a theory of aiding and abetting in two respects: first, that First City aided and abetted the Directors in breaches of fiduciary duty owed to Ashland, and second, that First City aided and abetted the waste and usurpation of Ashland's assets. The dismissal of the derivative claims on the basis of failure to make a demand does not prevent Lou from alleging aiding and abetting charges directly against First City.

Claims of aiding and abetting a breach of fiduciary duty relate to the internal affairs of a corporation and are governed by the law of the state of incorporation—in this case, Kentucky. *See e.g., Terrydale Liquidating Trust v. Barness,* 611 F.Supp. 1006 (S.D.N.Y.1984) (applying Missouri law), *aff'd,* 846 F.2d 845 (1988), *cert. denied,* — U.S. —, 109 S.Ct. 312, 102 L.Ed.2d 330 (1988). The dearth of Kentucky case law addressing aiding and abetting claims in this context has led both the parties and the court to look to the law of other states. *Accord id.* at 1015 (referring to law of other jurisdictions for guidance in aiding

and abetting claims where Missouri precedents were non-existent).

Under Delaware law, a claim of aiding and abetting a breach of fiduciary duty requires a plaintiff to plead three elements: (1) the existence of a fiduciary duty on the party of the primary wrongdoer; (2) a breach of the fiduciary's duty; and (3) a knowing participation in that breach by the alleged aiders and abettors. *See id.,* at 1016.

First City contends that apart from the specific elements of an aiding and abetting claim, courts have recognized the "general inappropriateness" of imposing aiding and abetting liability in litigation relating to corporate control issues, *see Barness,* 611 F.Supp. at 1027, and the right of a potential acquiror to pursue aggressively its own economic self-interest through arms' length dealings with the management of a target company. *See Repairman's Serv. Corp. v. National Intergroup, Inc.,* No. 7811, 1985 WL 11540 (Del.Ch. Mar. 15, 1985). Irrespective of the merits of either proposition, on a motion to dismiss, the question before the court is whether Lou has sufficiently alleged the essential elements of both aiding and abetting claims.

There is no dispute over the first two elements of the aiding and abetting claims. Lou has alleged both that Ashland owes a fiduciary duty to its shareholders and that Ashland breached that duty by engaging the Agreement to repurchase stock from First City. The dismissal motion turns on whether Lou has alleged sufficiently that First City knowingly participated in a transaction in which First City had knowledge that the Ashland Directors breached their fiduciary duty.

First City argues that because the repurchase of a corporation of its shares, whether denominated as greenmail or otherwise, is not inherently wrongful that it is incumbent on Lou to allege that First City had knowledge that the Directors breached their fiduciary duty by entering into the Agreement. Lou has met this requirement.

In the Complaint Lou alleges a scheme in which First City intentionally sought to

take advantage of the Ashland Directors's alleged motivation to preserve their own positions in Ashland. Lou alleges that the Belzberg's did this by creating a situation in which those Directors would have an incentive to enter into the Agreement to acquire the First City shares. Lou alleges that First City had notice of this incentive by the terms of the Agreement, including the standstill provision and the provision to release liability and the Ashland effort to secure the Kentucky antitakeover legislation. Finally, Lou alleges that First City knew both that their conduct artificially had inflated the Ashland stock price and that the Ashland Directors, by basing the Agreement price on an allegedly artificially inflated market price, were paying a premium for the Ashland stock which would harm Ashland and its shareholders.

The arms' length relationship between the parties, the price of the stock, the differing motives, the nature of the transaction, and the merits of the allegations are all irrelevant for purposes of the dismissal motion. To defeat a Rule 12(b)(6) motion Lou needs only to have alleged in the complaint any set of facts that, if proven, could establish the requisite elements of the aiding and abetting claims. The above allegations, if proven, may establish a knowing participation by First City in the Counts charged and thus First City's motion to dismiss with respect to Counts II and III in the Complaint are denied.

### 6. RICO Claims

■ Plaintiffs allege that First City violated RICO by (1) investing income derived from a pattern of racketeering activity in the "Belzberg Group" (18 U.S.C. § 1962(a)); (2) conducting or participating in the conduct of the affairs of the "Belzberg Group" through a pattern of racketeering activity (18 U.S.C. § 1962(c)); and (3) conspiring to commit the foregoing violations (18 U.S.C. § 1962(d)). The claims are all based on alleged predicate acts of mail and wire fraud, securities fraud, and violations of the Hart–Scott–Rodino statute purportedly committed by First City not only in connection with Ashland, but in prior transactions with other companies.

### A. RICO Requirements

RICO is applicable only if Lou can properly plead that the defendant has committed two or more of the predicate acts constituting a "pattern of racketeering activity." Section 1961(5) of RICO defines a "pattern of racketeering activity" as the commission of at least two acts of "racketeering activity" occurring within 10 years of each other. 18 U.S.C. § 1961(5). "Racketeering activity" is in turn defined to include any act "indictable" under a number of specific criminal provisions, including mail and wire fraud and securities fraud. 18 U.S.C. § 1961(1)(D).

The Second Circuit has delineated the constituent elements of any Section 1962 RICO violation:

> (1) that the defendant (2) through the commission of two or more acts (3) constituting a "Pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce.

*Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir.1983), *cert. denied sub nom.*, *Moss v. Newman*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

### B. Rule 9(b) and RICO

Rule 9(b) is fully applicable to RICO so that each of the alleged predicate acts of mail and wire fraud and securities fraud in connection both with the Ashland and the prior transactions must be pleaded with particularity. *E.g.*, *Zola v. Gordon*, 685 F.Supp. 354, 372 (S.D.N.Y.1988); *The Limited, Inc. v. McCrory Corp.*, 645 F.Supp. 1038, 1041 (S.D.N.Y.1986). Indeed, "all of the concerns that dictate that fraud be pleaded with particularity exist with even greater urgency in civil RICO actions." *Plount v. American Home Assurance Co., Inc.*, 668 F.Supp. 204, 206 (S.D.N.Y.1987). In addition to providing each defendant with a meaningful opportunity to prepare his defenses, "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus.*, 822 F.2d 1242, 1247 (2d Cir.1987).

### C. Predicate Acts

#### 1. 10(b)–10b–5 Claims

For the reasons discussed above, Lou has failed to plead adequately the Section 10(b) claims and thus a Section 10(b) claim cannot be considered as sufficiently alleged to constitute a predicate act for RICO.

#### 2. Mail and Wire Fraud as Predicate Acts

The requirements of Rule 9(b) "appl[y] with equal force to allegations of mail and wire fraud as predicate RICO civil offenses." *Rich–Taubman Assoc. v. Stamford Restaurant Operating Co.*, 587 F.Supp. 875, 878 (S.D.N.Y.1984). Where the alleged securities fraud violations underlying mail and wire fraud claims are not pleaded with the particularity required by Rule 9(b), the mail and wire fraud claims must be dismissed under Rule 9(b). *Bresson v. Thomson McKinnon Securities, Inc.*, 641 F.Supp. 338, [1986–87 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,855 at ¶ 94,158 (S.D.N.Y.1986).

To find violations of the mail and wire fraud statutes,[4] Lou must show "(1) participation in a scheme to defraud and (2) knowing use of the interstate mails or interstate wires to further the scheme." *Connors v. Lexington Ins. Co.*, 666 F.Supp. 434, 450 (E.D.N.Y.1987) (citing *United States v. Gelb*, 700 F.2d 875, 879 (2d Cir.1983), *cert. denied*, 464 U.S. 853, 104 S.Ct. 167, 78 L.Ed.2d 152 (1983)). It is the use of mail or interstate wire communications in furtherance of the scheme—not the fraudulent scheme itself—that is the predicate act. *United States v. States*, 488 F.2d 761, 767 (8th Cir.1973), *cert. denied*, 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974).

In finding violations of the mail and wire fraud statutes, the courts have interpreted broadly the meaning and scope of "scheme to defraud." In *Durland v. United States*, 161 U.S. 306, 313, 16 S.Ct. 508, 511, 40 L.Ed. 709 (1896), the Supreme Court ruled that a scheme or artifice to defraud is not limited to common law conception of fraud and false pretense, and that the mail-fraud statute condemns any conceivable kind of scheme to defraud in which the mails are employed. *United States v. Pick*, 724 F.2d 297, 300 (2d Cir.1983).

The Second Circuit recently confirmed that each separate use of the mail—or implicitly each separate case of interstate wire communication—in furtherance of a scheme constitutes a separate predicate offense. *Beauford v. Helmsley*, 865 F.2d 1386, 1392 (2d Cir.1989) (*en banc*) (citing *Badders v. United States*, 240 U.S. 391, 394, 36 S.Ct. 367, 368, 60 L.Ed. 706 (1916), *vacated,* — U.S. —, 109 S.Ct. 3236, 106 L.Ed.2d 584, *adhered to upon further consideration*, 893 F.2d 1433 (2d Cir.1989) (order), *cert. denied,* — U.S. —, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989). As long as the mailing or wire communications are for the purpose of executing the scheme, or "allegedly had the same goal," *Beauford*, at 1392, liability will attach under Section 1341. *See United States v. Maze*, 414 U.S. 395, 399, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974).

Here we find that Lou's complaint alleges the scheme to defraud to be the "greenmailing" of Ashland, (as well as an alleged series of prior similar greenmail transactions) and that the various uses of the mails and wires in communications among the multiple First City defendants constituted acts on behalf of that scheme. Nonetheless, the allegedly "numerous" uses of the mails and wires on behalf of the scheme to defraud are neither set out with particularity nor with respect to identifying the various defendants responsible. Absent conformity with Rule 9(b), none of these allegations is considered to constitute the requisite predicate acts for a RICO claim.

#### 3. Section 13(d) and Hart–Scott–Rodino as Predicate Acts

Absent the proper pleading of the Section 10(b) claims and wire and mail

---

**4.** Cases dealing with the mail fraud statute are also applicable to the wire fraud statute; the requisite elements for a scheme to defraud are shared under both statutes. *United States v.*

*Lemire*, 720 F.2d 1327, 1335 n. 6 (D.C.Cir.1983), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984).

fraud the question presented is whether the Section 13(d) violation and the alleged Hart–Scott–Rodino violation constitute predicate acts for purposes of RICO.

First City contends that failure to comply with reporting provisions, such as Section 13(d) and the Hart–Scott–Rodino Act, does not satisfy the statutory language of RICO that the violation concern "fraud in the sale of securities," as required by Title 18, U.S.C. § 1961(1). First City relies exclusively on the Ninth Circuit holding in *First Pacific Bancorp, Inc. v. Bro,* 847 F.2d 542, 546 (9th Cir.1988).

In *Bancorp* the defendants' violation of Section 13(d) involved a technical failure to comply with reporting requirements relating to a proxy solicitation and a shareholder derivative suit. The Ninth Circuit held that the violation did not concern "fraud in the sale of securities" under RICO. *Bancorp,* 847 F.2d at 546. In this context, the Ninth Circuit did not look favorably upon treating the Section 13(d) violation as a predicate act under RICO.

Here, the facts are significantly different. The United States District Court for the District of Columbia found that First City deliberately violated the filing requirement of Section 13(d) and permanently enjoined First City from future violations. *Securities Exchange Comm'n,* 688 F.Supp. 705, 724 (D.D.C.1988), *aff'd,* 890 F.2d 1215 (D.C.Cir.1989). The Court reasoned that First City was able to purchase shares of Ashland stock at an artificially low price because of this Section 13(d) violation. *Id.* at 724–25. Unlike the situation in *Bancorp,* the violations presented here center around the "sale of securities."

In cases more consistent with the factual backdrop presented here, courts have been willing to find that Section 13(d) violations may constitute a RICO predicate act. In *Spencer Companies, Inc. v. Agency Rent–A–Car, Inc.,* [1981–82 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,361, 1981 WL 1707 (D.Mass.1981), the plaintiff alleged as RICO predicate acts, violation of Section 13(d) through the filing of two series of

false and misleading Schedule 13Ds. The initial filings reported on the defendants's acquisition of a target company's stock. Although the Schedule 13D stated that such shares were acquired solely for investment purposes, plaintiff alleged that the acquisition was part of an attempt to take control of that company. *Spencer,* at ¶ 92,216. *See also Hanna Mining Co. v. Norcen Energy Resources, Lts.,* 574 F.Supp. 1172, [1982 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 98,742, ¶ 93,738 (N.D. Ohio 1982) (district court relied on *Spencer* in denying defendant's motion to dismiss and in holding that its violation of Section 13(d) constituted the requisite RICO predicate act).

■ The same reasoning applies to the Hart–Scott–Rodino March 27 filing. Although the Hart–Scott–Rodino statute establishes reporting requirements for antitrust purposes and is not specified as a predicate offense under 18 U.S.C. § 1961(1), the alleged violation of this requirement may still be considered to be a RICO predicate act. In this case, the alleged failure to comply with the requirements of the Hart–Scott–Rodino statute, like the failure to comply with Section 13(d), relates to "fraud in sale of securities," and thus may constitute a RICO predicate act.

■ Two predicate acts alone, however, do not constitute a "pattern of racketeering activity." *Beauford,* 865 F.2d at 1391. Rather, the plaintiff must allege both relatedness and continuity. *Id.* Although Lou need not allege multiple schemes or "an ongoing scheme with no demonstrable ending point", *see id.,* Lou must satisfactorily allege the relatedness and continuity aspects of the pattern of racketeering. *H.J. Inc. v. Northwestern Bell Telephone Co.,* —— U.S. ——, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989).

Recently, in *Procter & Gamble v. Big Apple Indus. Bldgs., Inc.,* 879 F.2d 10 (2d Cir.1989), the Second Circuit elaborated upon these required aspects of pleading a pattern of racketeering activity. The Court stated that:

For the purposes of RICO, "continuity" means that separate events occur over

time and perhaps threaten to recur, while "relatedness" means—given that different acts of racketeering activity have occurred—that there is a way in which the acts may be viewed as having a common purpose. These concepts are separately compartmentalized for analytic purposes, largely to ensure that the wrongful activity alleged is neither sporadic nor isolated, and that the acts have similar or common purpose and direction. *Procter & Gamble*, 879 F.2d at 17. The Court, in interpreting *Beauford*, stated that the requirement of relatedness there was met by plaintiffs having pled that more than 8,000 acts of alleged mail and wire fraud—"all directed toward the common goal of inflating profits from the conversion"—misled prospective buyers in a conversion of a large apartment complex into condominium units. *Id.* The Court further explained that the requirement of continuity was met in "the assertions in plaintiffs' complaint that a large percentage of apartments were as yet unsold...." *Id.*

Whether the predicate acts proved "establish a threat of continued racketeering activity depends on the specific facts of each case." *H.J. Inc.*, — U.S. —, 109 S.Ct. at 2896. "Continuity" according to the Supreme Court "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* Despite the existence of the two surviving predicate acts, Lou's complaint fails to establish the continuity requirement necessary to plead adequately a pattern of racketeering. In the complaint Lou simply presents a conclusory allegation that "the pattern of racketeering activity is a continuing one since the members of the Belzberg Group are continuing to look for fruitful opportunities for greenmail with respect to other companies." Complaint ¶ 78. In addition to the absence of any factual support for this conclusion, Lou, unlike the plaintiffs in *Beauford*, has failed to allege how the established predicate acts complained of present any aspect of continuity that can be relied upon to support the existence of a pattern of racketeering. *See, e.g., Procter Gamble*, 879 F.2d at 17. The absence of continuity or its threat is fatal to the RICO claim. *Miller v. Grigoli*, 712 F.Supp. 1087, 1095 (S.D.N.Y.1989). *See also Goldman v. McMahan, Brafman, Morgan & Co.*, 706 F.Supp. 256 (S.D.N.Y. 1989) (pattern requirement not satisfied where only properly pled predicate acts that might conceivably constitute a "pattern" did not present threat of continuity).

In the absence of an alleged pattern of racketeering activity, the sufficiency of the pleadings with respect to the other RICO requirements is not considered.

For the reasons set forth above, Ashland's motion to dismiss is granted. First City's motions for summary judgment and dismissal pursuant to Rules 12(b)(6) and 9(b) are granted in part and denied in part. Settle order on notice.

It is so ordered.