**THREE CROWN LIMITED PARTNER-SHIP, Three Crown Capital Partners, Meadowlands Fund, L.P. and H. Barndt Hauptfuhrer, Plaintiffs,**

**v.**

**CAXTON CORPORATION, Bruce Kovner, D. Scott Luttrell, Luttrell Capital Management, Steinhardt Partners, Steinhardt Management Corporation, Michael Steinhardt, Soros Fund Management, George Soros, Salomon Brothers, Inc., John Doe, Jane Doe, XYZ Corporation, XYZ Partnership, XYZ Insurance Company, XYZ Banking Company, XYZ Banking Corporation and XYZ Fund, Defendants.**

No. 92 Civ. 3142 (RLC).

United States District Court, S.D. New York.

Feb. 18, 1993.

---

Richards & O'Neill, New York City, for plaintiffs; Louis F. Burke, of counsel.

Cadwalader, Wickersham & Taft, New York City, for defendant Caxton Corp.; Richard Wiener, of counsel.

Cravath, Swaine & Moore, New York City, for defendant Salomon Bros., Inc.; Frederick A. O. Schwartz, Jr., of counsel.

Kavanagh Peters Powell & Osnato, New York City, for defendants D. Scott Luttrell and Luttrell Capital Management; Edward M. Little, of counsel.

Lankler Siffert & Wohl, New York City, for defendant Bruce Kovner; Frank H. Wohl, of counsel.

Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, NJ, for defendant Michael Steinhardt; Theodore V. Wells, Jr., of counsel.

Schulte Roth & Zabel, New York City, for defendants Steinhardt Management Corp., Steinhardt Partners, and Michael Steinhardt; Frederick P. Schaffer, of counsel.

Willkie Farr & Gallagher, New York City, for defendants Soros Fund Management and George Soros; Gerald Kerner, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

Plaintiffs bring this action alleging ten causes of action against Caxton Corporation, Bruce Kovner, D. Scott Luttrell, and Luttrell

Capital Management (collectively, the "Caxton Defendants"); Steinhardt Partners, Steinhardt Management Corporation, and Michael Steinhardt (collectively the "Steinhardt Defendants"); Soros Fund Management ("SFM") and George Soros (collectively, the "Soros Defendants"); and Salomon Brothers. The complaint asserts claims under (1) Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5; (2) the Commodities Exchange Act, 7 U.S.C. § 13(b); (3) the Racketeer Influenced Corrupt Organizations Act (RICO), 18 U.S.C. § 1962; (4) the Sherman Act, 15 U.S.C. §§ 1, 2; (5) common law fraud; and (6) intentional infliction of emotional distress. The Caxton, Soros and Steinhardt Defendants have each moved to dismiss these claims under Rules 8(a), 9(b), and 12(b), F.R.Civ.P.[1]

Three Crown alleges that, in or about March 1991, defendant Kovner, chairman of the board of Caxton, convened a meeting at which Luttrell, Caxton's chief bond trader; Soros, the president and chairman of the board of SFM; and Steinhardt, the president of Steinhardt Partners; a representative of Salomon and others were present. Luttrell allegedly highlighted the attractiveness of the Treasury's two year notes, particularly the imminent April issue. Steinhardt Partners subsequently acquired $4 billion and Caxton $2.5 billion of the April 1993 Two–Years (the "April Two–Years" or "April Treasury Notes") in the When–Issued Market.[2] By the early stages of the Secondary Market,[3] Steinhardt Partners and Caxton had each acquired substantial "long" posi-

tions of $8 billion of the April 1993 Two–Years, the equivalent of 133% of the issue. Plaintiffs took a substantial "short" position.

Plaintiff further avers that some or all of the defendants, acting together, thereafter "squeezed" the Secondary and Financing Markets[4] for the April Two–Years by restricting the supply and circulation of these securities through "anti-competitive conduct," including "anti-competitive financing." Specifically, Salomon's finance department allegedly conspired in the manipulation of the Secondary and Financing Markets for the April Two–Years by financing positions of the April notes for some or all of the other defendants, and Steinhardt and others financed a portion of their position in a manner allegedly designed to ensure that the securities could only be relent at great expense to the borrower. Moreover, on or about May 24, 1991, Luttrell informed Three Crown that Caxton was a large holder of April 1993 Two–Years, and would continue to hold the notes and acquire more rather than swapping out into other issues. As a result of this conduct, plaintiffs claim that the availability of April Two–Years in the Secondary and Financing Markets was severely restricted until mid-September, 1991, when the "squeeze" ended, and Three Crown was "forced to pay artificially inflated prices to purchase and premium rates to borrow the [April Treasury Notes] they required to cover their position." Complaint ¶ 69.

Shortly after the next Two–Year Treasury Note auction was announced, a Salomon em-

---

**1.** Defendant Salomon Brothers alone has filed an answer.

**2.** Between the date on which the Treasury announces a new issue and the settlement date ("the when-issued" period), dealers and investors actively trade this issue on a "when-issued" basis. The market for these trades is known as the "When–Issued Market." During the "when-issued" period, no money changes hands. On the settlement date, any entity that was a net buyer (or is "long") of the new issue in the When–Issued Market must make immediate payment for its net purchases and receives in return its new securities. Conversely, any entity that has been a net seller (or is "short") of the new issue during the when-issued period, must borrow or otherwise obtain the net amount of the new issue

and make delivery against immediate payment. Complaint ¶ 25.

**3.** Following the settlement date and until the date of maturity for the particular issue, the purchase and sale of the issue is said to take place on the "Secondary Market." Complaint ¶ 25.

**4.** A dealer wanting to finance particular securities can sell those securities to an investor and simultaneously agree to repurchase from the investor the same securities at a future date at a price equal to the original sale price plus an agreed-upon interest rate. The market in these repurchase agreements is called herein the "Financing Market," and is also known as the "Repo Market."

ployee allegedly informed representatives of Tiger Investments, a non-party in this action, that he believed Salomon's finance department would be in a position to dictate a "special rate"[5] in the Financing Market for May 1993 Two–Years (the "May Two–Years" or the "May Treasury Notes"). Salomon thereafter acquired for its own account and for the accounts of certain customers, $10.6 billion of the $11.3 billion in May 1993 Two–Years auctioned. Salomon was allegedly aware that Steinhardt had acquired at least $6 billion in the May Two–Years. Plaintiffs aver that Soros, acting in concert with Salomon and allegedly financed at premium rates by Salomon, also took a substantial position of over 35% in the When–Issued Market, so that Salomon, Steinhardt and Soros together allegedly controlled more than 140% of the May Treasury Notes. Moreover, plaintiffs allege that the defendants entered into financing agreements that were designed to reduce the number of May 1993 Two–Years circulating in the Financing Market.[6]

## I *Securities Exchange Act Claim*

### Rule 12(b)(6), F.R.Civ.P., Motion

Alone among the moving defendants, the Caxton defendants contend that a defect in the complaint precludes plaintiffs from satisfying several elements of a § 10(b) and Rule 10b–5 claim, and requires that the claim be dismissed pursuant to Rule 12(b)(6), F.R.Civ. P.[7]

5. An issue is said to be trading at a "special rate" when the interest rate paid by holders of the Treasury security to borrow cash against the security is significantly lower than the general collateralized rate. Complaint ¶ 72.

6. In a June 19, 1991 letter to the House Subcommittee on Telecommunications and Finance, Alan Greenspan, Chairman of the Federal Reserve, stated that a squeeze did occur in the May 1993 market. Complaint ¶ 47.

7. Section 10(b) makes it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or the mails, or any facility of any national securities exchange to "use or employ, in connection with the purchase or sale of any security registered on a national exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of" Securities and Exchange Commission rules. 15 U.S.C. § 78j(b).

Specifically, the Caxton defendants assert that the complaint alleges an incomprehensible scenario: On the one hand, contend the defendants, the complaint alleges that the plaintiffs strongly believed that the When–Issued, Secondary and Financing Markets in April and May Treasury Notes (hereafter, the "Relevant Markets") were being manipulated, and, in particular, that by late May of 1991 plaintiffs "knew everything" about the Caxton defendants role in the purported "squeeze." On the other hand, contend the defendants, the complaint reveals that after learning of the manipulation in late May of 1991, the plaintiffs nonetheless substantially increased their aggregate short position, a move which escalated any exposure plaintiffs had to the alleged "squeeze." According to the defendants, the plaintiffs' behavior as alleged in the complaint constitutes an attempt by the plaintiffs to "have their cake and eat it too" by using the securities laws as an insurance policy against losses in the securities markets.

Based on their interpretation of the complaint, the Caxton defendants contend that the plaintiffs have not sufficiently pled the materiality, reliance, transaction causation and loss causation elements of their § 10(b) and Rule 10b–5 claim. However, the defendants' attack with respect to each of these elements hinges on the court's acceptance of their interpretation of the complaint as described above.[8] Therefore, if the Caxton de-

Rule 10b–5 makes it unlawful to do the following: (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.-10b–5.

8. Although repetitive, the following constitute the Caxton defendants' attacks with regard to plaintiffs' § 10(b) and Rule 10b–5 claims: With respect to "materiality," the defendants contend that any factual omissions on their part could not have been "material" since plaintiffs did not reduce their short position in the April and May Two–Year Notes after becoming aware of the alleged manipulation in late May. As for "reliance," the defendants acknowledge that in a

fendants' reading of the complaint is rejected, all of their attacks as to the sufficiency of plaintiffs' § 10(b) claim must necessarily fail.

Although the defendants' reading of the complaint is interesting and may constitute a potent attack on plaintiffs' claim at a later stage of this litigation, it must be rejected at this stage based upon the well-known rule for deciding a motion to dismiss for failure to state a claim. The rule provides that for purposes of a Rule 12(b)(6), F.R.Civ.P., motion, plaintiffs' well-pleaded allegations must be accepted as true, together with such reasonable inferences as may be drawn in the plaintiffs' favor. *See e.g. Allen v. Westpoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991); *Qantel Corp. v. Niemuller*, 771 F.Supp. 1361, 1370 (S.D.N.Y.1991) (Leisure, J.).

 While the Caxton defendants are correct that Appendix A of the complaint [9] appears to indicate that plaintiffs increased their aggregate short position in the April Treasury Notes after the end of May, *see* Appendix A at 28–33, the defendants' assertion that the plaintiffs "knew everything" about the alleged manipulation by the end of May must be rejected. In particular, the defendants rely on Paragraph 65 which states that "[b]etween May 24 and June 28, 1991" plaintiffs and other market partici-

pants advised the Federal Reserve Bank of New York and the United States Treasury "of the manipulation" in the Relevant Markets. Complaint ¶ 65. However, a favorable inference for plaintiffs which may be drawn from this paragraph is that plaintiffs' initial phone calls to state and federal regulators in late May were query and concern oriented, and they did not fully understand that a "squeeze" had occurred in the relevant markets until late June. This inference is further supported by allegations in the complaint that it was not until the "last week of June" that plaintiffs "became aware" that the notes were "no longer freely trading in the Secondary Market," and that alleviation of the squeeze was not going to happen. Complaint ¶ 65–66.[10]

Accepting plaintiffs' contention, as the court must at this stage of the proceedings, that they were not fully aware of the manipulation until late June, rather than the late May date asserted by defendants, the Caxton defendants' Rule 12(b)(6) attack on the sufficiency of the Section 10(b) and Rule 10b–5 pleadings must be rejected.

### Rule 9(b), F.R.Civ.P., Motion

The Caxton, Soros and Steinhardt defendants all move to dismiss plaintiffs' § 10(b) and Rule 10b–5 claim pursuant to Rule 9(b),

---

§ 10(b) claim based upon the "fraud on the market" theory, which is the theory alleged in this case, there is a rebuttable presumption of reliance on the integrity of the market; *see Basic Inc. v. Levinson*, 485 U.S. 224, 247–58, 108 S.Ct. 978, 991–97, 99 L.Ed.2d 194 (1988), however, they argue that the complaint itself rebuts the presumption of reliance because its allegations show that plaintiffs were speculators who increased their short position even after learning in late May that the integrity of the relevant markets was compromised by manipulation.

As for proving "transaction causation," the defendants argue that the plaintiffs' post-May 24 activity contradicts plaintiffs' allegations that they took their "short" position because they were uninformed and that had they been informed, they would not have suffered a loss. Finally, with respect to "loss causation," defendants contend that since plaintiffs increased their short position after concluding the market was being manipulated, their loss was not proximately caused by the alleged manipulation but rather was the outcome of plaintiffs' own speculative trading.

**9.** Appendix A appears to be a document recording purchases and sales of various futures and government securities made by the plaintiffs.

**10.** The Caxton defendants request that pursuant to Rule 201(b)(2), F.R.Evid., the court take judicial notice of a chronology of phone calls submitted by the Federal Reserve Bank of New York in a hearing before the U.S. House of Representatives Subcommittee on Telecommunications and Finance of the Committee on Energy and Commerce. Under Rule 201(b)(2), the court may take judicial notice of facts which are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." The defendants want to introduce the chronology because it lists a phone call between plaintiffs and the bank made on May 23, 1991 which contains the notation that the call was "to discuss the 2-yr note market situation." Defendants request is denied because the chronology is not evidence whose accuracy cannot reasonably be questioned. Moreover, even if the court took judicial notice of the chronology, it does not prove that plaintiffs had full knowledge of the manipulation as opposed to initial queries or concerns about the market.

F.R.Civ.P., for failure to plead fraud with particularity. A § 10(b) claim is subject to the requirements of Rule 9(b), F.R.Civ.P.. *See Thornock v. Kinderhill Corp.*, 712 F.Supp. 1123, 1128 (S.D.N.Y.1989) (Sweet, J.). Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

■ The moving defendants all take issue with plaintiffs' "information and belief" pleading. Despite Rule 9(b)'s generally rigid requirement that the "circumstances constituting fraud [be] stated with particularity," allegations may be based on "information and belief when facts are peculiarly within the opposing party's knowledge." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990); *see also, DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247–1248 (2d Cir.1987); *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989). In this case where manipulation is alleged, as opposed to affirmative misrepresentation, some or all of the facts will be in the control of the defendants and inaccessible to the plaintiffs without discovery. *See Brickman v. Tyco Toys, Inc.*, 722 F.Supp. 1054, 1060 (S.D.N.Y.1989) (Carter, J.). Therefore, the plaintiffs must be allowed some information and belief pleading.

■ However, this exception allowing information and belief pleading is not free license to base claims of fraud on "speculation and conclusory allegations," rather the complaint must "adduce specific facts supporting a *strong inference* of fraud." *Wexner*, 902 F.2d at 172 (emphasis added). In particular, allegations based on information and belief must be accompanied by a statement of facts upon which the belief is founded. *Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir.1972). Despite this requirement, plaintiffs' complaint is based almost entirely on information and belief without accompanying

statements of the facts upon which the allegations are founded. This is impermissible.[11]

■ In addition, the defendants contend that the complaint does not adequately specify their respective roles in the manipulation. Under Rule 9(b), F.R.Civ.P., where multiple defendants are charged with fraud, the complaint must be specific as to the nature of each defendant's alleged participation in the fraud. *DiVittorio*, 822 F.2d at 1247. Despite this requirement, most all of the allegations in plaintiffs' complaint as to each defendant's role in the manipulation are alleged on information and belief without a statement of the source of information and the reasons upon which the belief is founded. Throughout the complaint defendants are clumped together in vague allegations regarding "some or all of the defendants." Such widescale clumping is unacceptable. *See, The Limited, Inc. v. McCrory Corp.*, 645 F.Supp. 1038, 1043–45 (S.D.N.Y.1986) (Carter, J.). For example, although plaintiffs provide some factual support for their allegation that a squeeze of the May Treasury Notes occurred, Complaint ¶ 47, they provide no particularized facts as to why the Caxton, Steinhardt and Soros defendants are necessarily implicated in that squeeze.

■ The moving defendants third attack with respect to Rule 9(b), F.R.Civ.P., is that plaintiffs have failed to plead scienter with the requisite specificity. A valid § 10(b) claim must allege scienter. *See, Ochs v. Shearson Lehman Hutton, Inc.*, 768 F.Supp. 418, 427 (S.D.N.Y.1991) (Haight, J.). While Rule 9(b), F.R.Civ.P., allows scienter to be averred generally, such allegations must be supported by facts giving rise to a "strong inference" of fraudulent intent. *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987), *cert. den.*, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), *overruled on other grounds, United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989) (en banc), *cert. den.*, 493 U.S. 811, 110 S.Ct. 56,

---

11. The plaintiffs contend that the Treasury scandal alleged in their complaint has been widely covered by the media for well over a year and that numerous other actions have been filed based on the same events, so that defendants cannot possibly allege that they are "in the dark" as to what their suit is about. Plaintiffs cannot be permitted to free ride off the press or the complaints of other parties filing similar lawsuits, rather they must prove to the court that their complaint is backed by specific facts supporting a "strong inference" of fraud.

107 L.Ed.2d 24 (1989). To satisfy the scienter requirement, a plaintiff may allege facts showing a motive, or where motive is not apparent, a plaintiff may plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater. *Id.* at 50; *see also, Rooney Pace, Inc. v. Reid,* 605 F.Supp. 158, 162 (S.D.N.Y.1985) (Weinfeld, J.) (where alleged fraudulent conduct is market manipulation proof of knowledge likely to be in defendants' exclusive control, evidence of intent must await discovery).

■ The plaintiffs argue that the following six points constitute the "requisite factual predicates to support a strong in[ ]ference of defendants' fraud": (1) defendants met in March 1991, (2) defendants thereafter took massive positions in the April and May Two-Years, (3) at least one defendant (D. Scott Luttrell) admitted to holding enormous positions, (4) a Salomon Brother representative said that the May 1993 Two-Years were going to trade "on special," (5) defendants engaged in restrictive financing, and (6) defendants made enormous profits. Plaintiffs Brief at 16.

There are a host of problems with plaintiffs' list of "factual predicates." First, although the complaint describes a May 1991 meeting, it contains no allegations that defendants made any plans to manipulate the When-Issued, Secondary and Financing markets for April and May Two-Year Treasury Notes at that meeting; rather, the complaint indicates the meeting was convened for the harmless purpose of discussing "various investment alternatives." Complaint ¶ 50. Second, examination of the complaint reveals that plaintiffs' second, third and fifth alleged factual predicates, are not facts but allegations pled on information and belief without accompanying statements of fact. Complaint ¶ 53–56, 73–74, 58–62, 64, 77–78. In addition, while plaintiffs characterize their third and fourth alleged factual predicates as admissions of fraudulent activity, their complaint does not provide any context for such an assumption.[12]

While the fourth predicate provides some weak allegations of scienter with respect to defendant Salomon Brothers, Inc., who is not a moving defendant, the allegation is irrelevant to the moving defendants. Complaint ¶ 72. The sixth predicate provides a conclusory allegation in support of motive with respect to the moving defendants, but does not constitute a "strong inference" of fraudulent intent.

■ In sum, the six "factual predicates" put forth by the plaintiffs do not give rise to a "strong inference" that the moving defendants acting alone or in concert manipulated the Relevant Markets. Plaintiffs' § 10(b) and Rule 10b–5 claim must be dismissed pursuant to Rule 9(b), F.R.Civ.P.[13]

12. Paragraph 64 of the complaint is not an admission of fraud, rather it merely states Luttrell "informed" plaintiff Three Crown that Caxton was a "large holder" of April Two-Year Notes. Although plaintiffs' brief alleges that an admission to trading "on special" is tantamount to a confession of manipulation, there is no support for this inference in Paragraph 72 of the complaint.

13. After this motion was fully briefed, plaintiffs submitted a letter ("the November 13, 1992 letter"), stating that they have now obtained access to certain Salomon Brothers documents and are in a position to bolster their complaint with more factual detail. Plaintiffs assert that they will be able to amend their complaint to include allegations substantially similar to a class action complaint recently filed before Judge Patterson of the Southern District of New York in *In re Salomon Brothers Treasury Litigation,* 91 Civ. 5471 (RPP), 1992 WL 350762. Plaintiffs request that if the court determines that their complaint does not satisfy Rule 9(b), F.R.Civ.P., the court should, in the interest of "judicial economy," review the *In re Salomon Brothers* complaint rather than requiring plaintiffs to amend their complaint.

A comparison of plaintiffs' complaint with the *In re Salomon Brothers* complaint serves only to highlight the inadequacy of plaintiffs' complaint. There is little, if any, information and belief pleading in the other complaint, and many specific details are provided with respect to the role of the Steinhardt and Soros defendants in the alleged manipulation of the April and May 1991 Two-Year Treasury Notes. On the other hand, the Caxton defendants are not named as defendants in that complaint, and the complaint contains only one paragraph making an allegation with respect to Caxton.

However, the court is unable to consider the complaint before Judge Patterson for purposes of determining whether the plaintiffs in this case have pled fraud with particularity. Since Rule 9(b), F.R.Civ.P., is a rule of pleading, only plain-

## II *Commodities Exchange Act Claim*

The Caxton and Steinhardt defendants have moved to dismiss plaintiffs' claim under § 9(b) of the Commodities Exchange Act (CEA), 7 U.S.C. § 13(b), for failure to state a claim pursuant to Rule 12(b)(6), F.R.Civ.P..

Section 9(b) of the CEA makes it a felony for any person "to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any contract market, or to corner or attempt to corner any such commodity...." 7 U.S.C. § 13(b). Although § 9(b) is a criminal provision, § 22(a)(1) of the CEA provides a private right of action for violations of the substantive provisions of the CEA, including § 9(b). *See, Grossman v. Citrus Associates of New York Cotton Exchange, Inc.*, 706 F.Supp. 221, 230–231 (S.D.N.Y.1989) (Haight, J.).

Section 22(a)(1) of the CEA lays out what are in essence "conditions precedent" which must be alleged in addition to the elements required to plead a violation of one of the substantive violations of the CEA; otherwise, the complaint will not survive a Rule 12(b)(6),

F.R.Civ.P., motion. *See Id.; In re Conticommodity Services, Inc., Securities Lit.*, 733 F.Supp. 1555, 1567 (N.D.Ill.1990). Plaintiffs in this case rely on clause (D) of § 22(a)(1) which requires plaintiffs to allege that the defendants violated the CEA by manipulating the price of a futures contract purchased or sold by plaintiffs, or by manipulating the price of a commodity underlying that futures contract.[14]

With respect to their CEA claim, plaintiffs allege: (1) that defendants manipulated "one or more commodities in which plaintiffs traded, as set forth in Appendix A," and (2) that "[p]laintiffs were damaged by the foregoing conduct in connection with plaintiffs' purchases and sales of futures contracts as set forth in Appendix A...." Complaint ¶¶ 101, 102.[15] Thus, the complaint accuses the defendants of manipulating the price of the commodities *underlying* the futures contracts purchased or sold by the plaintiffs, not the price of the futures contracts themselves.[16] The only manipulation described in the complaint is of the When–Issued, Secondary and Financing Markets in Two–Year

---

tiffs' complaint may be examined to determine whether the rule has been satisfied; allegations made in briefs, affidavits, supplemental letters, or complaints submitted by other plaintiffs do not satisfy the Rule 9(b) pleading requirement. *See, Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg*, 651 F.Supp. 877 (D.Conn. 1986); *see also, Goldberg v. Meridor*, 81 F.R.D. 105, 111 (S.D.N.Y.1979) (Lasker, J.) (affidavits cannot cure lack of specificity in fraud complaint).

**14.** The relevant portion of § 22(a)(1), 7 U.S.C. § 25(a)(1), states as follows:

Any person ... who violates this chapter ... shall be liable for actual damages resulting from one or more of the transactions referred to in clauses (A) through (D) ... and caused by such violation to any other person—
 (B) who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity) ...
 (D) who purchased or sold a contract referred to in clause (B) hereof if the violation constitutes a manipulation of the price of any such contract or the price of the commodity underlying such contract.

**15.** The Steinhardt defendants argue that these allegations are so vague and conclusory that the complaint fails to satisfy the liberal standard of

Rule 8(a), F.R.Civ.P. The Steinhardt defendants are correct that if these are plaintiffs' only allegations with respect to their CEA claim, then the allegations are "so badly conclusory that they fail to give notice of the basic events and circumstances of which the plaintiff[s] complain[ ]," and that the allegations are "meaningless as a practical matter and, as a matter of law, insufficient to state a claim." *Duncan v. AT & T Communications, Inc.*, 668 F.Supp. 232, 234 (S.D.N.Y. 1987) (Carter, J.). However, based on plaintiffs' brief and the structure of the complaint, most likely the plaintiffs intend for their allegations about the manipulation of the When–Issued, Secondary and Financing Markets for April and May Two–Year Treasury Notes to serve as an elaboration of their CEA claim.

**16.** If plaintiffs are instead alleging that defendants manipulated "futures contracts" purchased by plaintiffs, their complaint must be dismissed for failure to meet even the liberal pleading standards of Rule 8(a), F.R.Civ.P. Paragraph 100 contains the only reference to trading in futures contracts done by defendants. Paragraph 100 states "upon information and belief" defendants traded in "Treasury Bill futures and other financial futures traded by plaintiffs." Aside from being much too vague as to what futures defendants traded, this paragraph does not even allege that defendants "manipulated" any of those futures.

Treasury Notes maturing in April and May of 1993. Complaint ¶ 45, 49–81. The only futures contracts specifically identified in the complaint as ones in which plaintiffs traded are Treasury bill futures and eurodollar futures. Complaint ¶ 83, 100.[17]

However, the Caxton defendants assert that plaintiffs' allegations do not satisfy § 22(a)(1)(D) because their CEA claim is based on the "absurd and mistaken proposition" that the April and May Treasury Notes traded by defendants constituted the commodities "underlying" the Treasury bill and eurodollar futures contracts traded by plaintiffs. According to the defendants, Treasury *bills* (not Treasury notes) are the commodity underlying Treasury bill futures and eurodollars are the commodity underlying eurodollar futures.

Defendants are correct that plaintiffs' theory of manipulation is not one for which there is a private right of action under § 22(a)(1)(D). Based on standard definitions of a "futures contract," the phrase "the commodity underlying such [futures] contract" in § 22(a)(1)(D) refers to the commodity specified within the particular futures contract. *See, e.g.,* Commodity Futures Trading Commission Act of 1974, S.Rep. No. 93–1131, 93d Cong., 2d Sess 130 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5856, 5863; *Leist v. Simplot,* 638 F.2d 283, 286 (2d Cir.1980) (citing 1 Bromberg & Lowenfels, Securities Fraud & Commodities Fraud § 4.6(421) (1979)). For example, the May 1976 Maine potato futures contract at issue in *Leist* was a contract for Maine grown potatoes. *Id.* at 286.

Thus, while defendants' alleged manipulation of the When–Issued, Secondary and Financing Markets in Treasury notes may have adversely impacted positions plaintiffs took in the Treasury bill and eurodollar futures markets, Treasury notes are not the commodity "underlying" either Treasury bill futures or eurodollar futures. Since plaintiffs have not adequately pled the "condition precedent" in § 22(a)(1)(D),[18] defendants' motion to dismiss plaintiffs claim under Section 9 of the CEA is granted.[19]

17. Although the complaint at ¶ 101–102 refers to Appendix A as the source for details as to the commodities and futures in which plaintiffs traded, the appendix is not much help to defendants or the court in comprehending the charges leveled against the defendants. As to each entry there is no clear indication as to what financial instrument is involved other than a maturity date, a "TCLP International Arbitrage Number" and a coupon number; no key is provided to decipher the meaning of these numbers.

18. The Steinhardt and Caxton defendants also argue that pursuant to § 2(a)(1)(A) of the CEA, the so-called Treasury Amendment, the CEA is inapplicable to manipulations in the When–Issued, Secondary and Financing Markets of April and May Two–Year Treasury Notes. The Treasury Amendment provides: Nothing in this chapter ... shall be deemed to govern or in any way be applicable to transactions ... in government securities, ... unless such transactions involve the sale thereof for future delivery conducted on a board of trade. 7 U.S.C. § 2. Although an exemption to a remedial statute normally must be pled as an affirmative defense, when the facts alleged in a complaint give rise to an affirmative defense, it may be raised in a pre-answer motion to dismiss. *See, e.g., Green v. Maraio,* 722 F.2d 1013, 1019 (2d Cir.1983). Plaintiffs complaint does admit that Treasury notes are "government securities." Complaint ¶ 19. However, although defendants provide support in their briefs that transactions in the When–Issued, Secondary and Financing Markets for Treasury Notes are not transactions involving "the sale thereof for future delivery conducted on a board of trade," factual allegations in briefs and memoranda may not be considered in a Rule 12(b)(6), F.R.Civ.P., motion. *See, Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). Thus, although the Treasury Amendment exemption may be applicable, such an argument is premature at this time.

19. Defendants also argue that plaintiffs' CEA claim should be dismissed under Rule 9(b), F.R.Civ.P.. While courts apply Rule 9(b), F.R.Civ.P., to § 4 of the CEA, *see, e.g., Karasyk v. Marc Commodities Corp.,* 770 F.Supp. 824, 829 (S.D.N.Y.1991) (Haight, J.), the antifraud provision of the CEA, no court has determined whether Rule 9(b), F.R.Civ.P. applies to § 9(b) of the CEA, the manipulation provision. Although the Supreme Court in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), has defined "manipulation" under § 10(b) of the Securities Exchange Act as "intentional or willful conduct designed to deceive or *defraud,*" whether the same definition should be applied to § 9(b) of the CEA is an interesting question given the existence of a separate antifraud section in the CEA. However, there is no need to reach this issue since plaintiffs' CEA claim has been dismissed pursuant to Rule 12(b)(6), F.R.Civ.P..

## III *The RICO Claims*

The complaint alleges several violations of RICO. Claim four charges all the defendants with acquiring or maintaining, through a pattern of racketeering activity, interest in or control of the Relevant Markets in United States Treasury Notes in violation of 18 U.S.C. § 1962(b). Claims three and six charge the defendants with conducting the affairs of various enterprises, affecting foreign and interstate commerce, through a pattern of racketeering activity in violation of § 1962(c). Claim five charges the defendants with conspiracy to violate the aforementioned provisions in violation of § 1962(d).

### Rule 12(b)(6) Motion

■ The Caxton and Soros Defendants argue that the RICO claims should be dismissed pursuant to Rule 12(b)(6), F.R.Civ.P. because plaintiffs have not alleged "continuity", and continuity is an essential element of a RICO "pattern". *See, e.g., Indelicato,* 865 F.2d at 1381. The Supreme Court recently elaborated on this aspect of a RICO claim:

> " 'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal activity. Often a RICO action will be brought before continuity can be established in this way. In such cases liability depends on whether the *threat* of continuity is demonstrated."

*H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 241, 109 S.Ct. 2893, 2902, 106 L.Ed.2d 195 (1989) (citation omitted; emphasis in original).

The Caxton and Soros defendants contend that the alleged conduct was too short-term to constitute "closed-ended continuity." Since the alleged manipulation of the April and May Two–Years ended in mid-September, 1991, the duration of the scheme was at most six months. Six months is inadequate to establish closed-ended continuity. *See F.N. Wolf & Co. v. Estate of Neal,* [1990–91 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,805 at 98,875, 1991 WL 34186 (S.D.N.Y. Feb. 25, 1991) (Haight, J.) (one year insufficient to satisfy closed-ended continuity); *Azurite Corp. Ltd. v. Amster & Co.,* 730 F.Supp. 571, 581 (S.D.N.Y.1990) (Leisure, J.) (seven months insufficient); *Airlines Reporting Corporation v. Aero Voyages, Inc.,* 721 F.Supp. 579 (S.D.N.Y.1989) (Sweet, J.) (thirteen months insufficient).

■ Since plaintiffs do not show closed-ended continuity, the complaint must suggest a "distinct threat of long-term racketeering activity, either implicit or explicit," *H.J., Inc.,* 492 U.S. at 241–42, 109 S.Ct. at 2902 (i.e., "open-ended continuity"), in order to satisfy the pattern requirement. Such a threat can be inferred from the nature of the enterprise if it existed for criminal purposes or the predicate acts were part of the defendant's regular way of doing business. *Id.,* 492 U.S. at 242–43, 109 S.Ct. at 2902.[20] Since the alleged enterprises were not criminal organizations and the complaint has not alleged any facts from which it could be inferred that the Caxton or Soros defendants' acts were part of their regular way of doing business,[21] proof of open-ended continuity must be found in some factor other than the enterprise itself. *See, e.g., Beauford v. Helmsley,* 865 F.2d 1386, 1391 (2d Cir.1989).

■ Open-ended continuity can be demonstrated from the sheer number of predicate acts or schemes, *Procter & Gamble v. Big Apple Indus. Bldgs., Inc.,* 879 F.2d 10, 17 (2d Cir.1989) (five schemes raised the "spectre of continuity"), however the plain-

---

20. *See also U.S. v. Indelicato,* 865 F.2d 1370, 1383–4 (2d Cir.1989).

21. *See, e.g., Barrett v. United States Banknote Corporation,* 806 F.Supp. 1094, 1101 (S.D.N.Y. 1992) (Patterson, J) (plaintiff's allegations did not suggest that defendants' acts were a regular way of conducting its ongoing legitimate business).

tiffs merely allege that the Caxton defendants participated in the April scheme, and the Soros defendants participated in the May scheme.[22] Plaintiffs contend that the complaint nevertheless suggests open-ended continuity because a threat of continuity "may be established without proof of multiple schemes, multiple episodes, or multiple transactions," see, e.g., Indelicato, 865 F.2d at 1381; Beauford, 865 F.2d at 1391. In the case of a single scheme, however, the complaint must plead some "basis from which it could be inferred that the acts of racketeering activity were neither isolated nor sporadic." Beauford, 865 F.2d at 1391.[23] "[T]o infer a threat of repeated fraud [merely] from a single alleged scheme would in effect render the pattern requirement meaningless." Continental Realty Corp. v. J.C. Penney Co., Inc., 729 F.Supp. 1452, 1455 (S.D.N.Y.1990) (Sand, J.). Since the complaint falls short of suggesting closed- or open-ended continuity with regard to the Soros and Caxton defendants, their motions to dismiss all the RICO claims are granted.

In light of plaintiffs' November 13, 1992 letter,[24] which contains additional allegations concerning the Soros defendants, the second amended complaint will likely contain sufficient factual allegations suggesting continuity as to them. Thus, in the interest of judicial economy, the Soros defendants' alternate arguments for dismissal of the RICO claims under Rule 12(b)(6) will be considered.

■ Soros contends that the fourth claim must be dismissed because the alleged "enterprise," the Relevant Markets in United States Treasury Notes, cannot constitute an "enterprise" for RICO purposes.[25] However, the Second Circuit has interpreted "enterprise" very broadly. See, e.g., Brennan v. United States, 867 F.2d 111, 121 (2d Cir. 1989); United States v. Bagaric, 706 F.2d 42, 55–57 (2d Cir.), cert. denied, 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983). The defendants have failed to distinguish the Relevant Treasury Note Markets adequately from the gamut of enterprises which have been found to fall within RICO's scope. See, e.g., United States v. Angelilli, 660 F.2d 23, 30–35 (2d Cir.1981), cert. denied, 455 U.S. 945, 102 S.Ct. 1442, 71 L.Ed.2d 657 (1982); United States v. Mazzei, 700 F.2d 85, 88–89 (2d Cir.1983); United States v. Errico, 635 F.2d 152, 156 (2d Cir.1980).[26]

■ Soros further contends that the sixth claim must be dismissed as to him because it does not allege that the person participating in the enterprise (Soros) was distinct from the enterprise (SFM). Section 1962(c) "clearly envisions" that the enterprise and person are two different entities. Bennett v. United States Trust Co. of New York, 770

---

**22.** The complaint alleges in a purely conclusory manner that all the defendants "would have persisted indefinitely in their unlawful schemes had their conduct not been discovered by federal regulators." Complaint ¶ 115, 127, and 151. However, the complaint provides no basis for this conclusion insofar as the Soros and Caxton defendants are concerned. By contrast, the complaint does allege that "At least one defendant, Salomon, has engaged in a pattern of manipulating the Treasury securities issued at other Treasury auctions from August 1989 until August 1991." Complaint ¶ 46. In addition, the Steinhardt defendants allegedly participated in both the April and May schemes.

**23.** See, e.g., U.S. v. Kaplan, 886 F.2d 536, 543 (2d Cir.1989) ("Where external facts . . . demonstrate a defendant's continuing intent and ability to participate in various ways in the corruption of the enterprise, a trier of fact may find that the predicate acts entail a threat of continuing racketeering activity."); Langer v. Barclays Bank of New York, No. 91 Civ. 3515 (LMM), 1992 WL

296410, *4 (S.D.N.Y. October 2, 1992) (McKenna, J.).

**24.** See note 13, supra.

**25.** 18 U.S.C. § 1961(4) defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity".

**26.** Without citing any caselaw, Caxton also argues that the Relevant Markets in United States Treasury Notes are not appropriate enterprises because defendants could not possibly exercise "control" over them within the meaning of § 1962(b). However, "control" like the other RICO elements must be read broadly, see, e.g., Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 497–98, 105 S.Ct. 3275, 3285–86, 87 L.Ed.2d 346 (1985); c.f. United States v. Jacobson, 691 F.2d 110, 112–13 (2d Cir.1982) (reading "interest in" in § 1962(b) broadly), and surely encompasses the ability to manipulate at issue here.

F.2d 308, 315 (2d Cir.1985).[27] Since SFM is a sole proprietorship owned by Soros and he is the president and chairman of the board, Complaint ¶¶ 14, 15, they are not distinct entities for the purpose of Section 1962(c). *Compare Jacobson v. Cooper*, 882 F.2d 717, 720 (2d Cir.1989) ("[W]here the overlap between the alleged defendants and the alleged RICO enterprise is only partial, a RICO claim may be sustained.")[28] Thus, claim six must be dismissed as to the Soros defendants on this additional ground.[29]

### Rule 9(b) Motion

■ The Steinhardt, Caxton and Soros defendants contend that plaintiffs' RICO claims must be dismissed as to them because the plaintiffs have failed to allege "racketeering activity" with sufficient particularity as required by Rule 9(b), F.R.Civ.P.[30] Since plaintiffs' predicate security fraud claims are inadequate under Rule 9(b), they cannot provide a basis for their RICO claims. *See, e.g., Lou v. Belzberg*, 728 F.Supp. 1010, 1025 (S.D.N.Y.1990) (Sweet, J.); *Continental Realty Corp.*, 729 F.Supp. at 1455. Similarly, since plaintiffs' predicate mail and wire allegations are based on their securities fraud claims, they are also defective. *See, e.g., Lou*, 728 F.Supp. at 1025; *Bresson v. Thomson McKinnon Securities, Inc.*, 641 F.Supp. 338, 348 (S.D.N.Y.1986) (Goettel, J.). Thus, the RICO claims are dismissed as to all the defendants for failure to plead fraud with particularity.

### IV The Sherman Act Claims

The complaint also charges the defendants with conspiring to restrain trade in the When–Issued, Secondary, and Financing Markets for the April and May Two–Years in violation of the Sherman Act § 1, and conspiring to monopolize these markets in violation of the Sherman Act § 2.[31] The Caxton, Soros and Steinhardt defendants claim that the antitrust causes of action are insufficient to satisfy the pleading requirements of Rule 8(a), F.R.Civ.P. and should be dismissed under Rule 12(b)(6).[32] Their moving papers cite a laundry list of purported shortcomings in the complaint, e.g., that plaintiffs: fail to provide adequate notice to them of their respective roles in the alleged conspiracy; do not cite any specific incidents of concerted action; and do not describe who coordinated

---

**27.** *Cullen v. Margiotta*, 811 F.2d 698, 730 (2d Cir.), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987), cited by plaintiffs, is not to the contrary. That case held that "the same entity may be both a RICO 'person' and *a member* of the 'enterprise.'" (emphasis added) Thus, in *Cullen*, the enterprise was comprised of additional persons.

**28.** Plaintiffs' Memorandum attempts to recast claim six by suggesting that the "enterprise" there alleged is not SFM, but an association-in-fact of all defendants. Plaintiffs cannot cure their pleading deficiency in this misleading manner. The sixth cause of action clearly defines Soros as an "Individual Defendant," SFM as an "enterprise," and alleges that "The Individual Defendants ... conducted the affairs of *their respective enterprises* through a pattern of racketeering." (emphasis added) ¶¶ 143, 144, 147.

**29.** The Caxton Defendants further argue that the plaintiffs have not demonstrated that their injury was proximately caused by the RICO violation because plaintiffs increased their April Two–Year short position after concluding that the market was being manipulated. For the reasons set forth in the above discussion of the § 10(b) claim, Caxton's theory must be rejected at this stage in the litigation. Reading the complaint in the light most favorable to nonmovant, proxi-

mate cause is adequately alleged. *See* Complaint ¶ 69. *Compare Sperber v. Boesky*, 849 F.2d 60, 64–65 (2d Cir.1988).

**30.** Rule 9(b), F.R.Civ.P., applies to these RICO claims because the alleged predicate acts are fraud in the sale of securities, mail fraud and wire fraud. *See, e.g., Lou v. Belzberg*, 728 F.Supp. 1010, 1025 (S.D.N.Y.1990) (Sweet, J.).

**31.** Section 1 of the Sherman Act makes "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations ... illegal." 15 U.S.C. § 1. Section 2 makes it unlawful to "monopolize or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states ..." 15 U.S.C. § 2. Pursuant to Section 4 of the Clayton Act, private civil action may be brought by any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws ..." 15 U.S.C. § 15.

**32.** Rule 8(a), F.R.Civ.P. provides, in pertinent part, "A pleading which sets forth a claim for relief ... shall contain ... a short plain statement of the claim showing that the pleader is entitled to relief ..."

the conspiracy, what was agreed, or when and where the combination took place.

However, the degree of specificity demanded by defendants is clearly not required by Rule 8(a), F.R.Civ.P. *Nagler v. Admiral Corp.*, 248 F.2d 319, 322–23 (2d Cir.1957), repudiated the idea that some special pleading is required in antitrust cases, and the law of this Circuit has been clear ever since.[33] *See, e.g., George C. Frey Ready–Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 554 (2d Cir.1977) ("a short plain statement of a claim for relief which gives notice to the opposing party is all that is necessary in antitrust cases."); *Newburger, Loeb & Co. v. Gross*, 365 F.Supp. 1364, 1367–68 (S.D.N.Y.1973) (Ward, J.) ("skeletal" allegations sufficient to withstand a motion to dismiss).[34]

Moreover, in antitrust cases, where proof is often in the control of the alleged conspirators, *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976). Although "antitrust law limits the range of permissible inferences from ambiguous evidence[,]" *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir.1987), the evidence of conspiracy "must be viewed as a whole to determine the reasonableness of [the] inferences drawn[.]" *International Distribution Centers, Inc. v. Walsh Trucking*, 812 F.2d 786, 794 (2d Cir.1987).

The requisite elements of a Section 1 claim are: (1) concerted action; (2) by two or more persons; (3) that unreasonably restrains interstate or foreign trade or commerce. *Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F.Supp. 832, 837, 838 n. 9 (S.D.N.Y.1988) (Leisure, J.). Under Section 2, the elements of conspiracy to monopolize are: "(1) proof of concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy." *Paralegal Institute, Inc. v. American Bar Ass'n*, 475 F.Supp. 1123, 1132 (E.D.N.Y.1979), *aff'd mem.*, 622 F.2d 575 (2d Cir.1980); *International Distribution Centers, Inc.*, 812 F.2d at 795–96. The alleged facts, viewed as a whole, provide sufficient basis from which all the elements in plaintiffs' Section 1 and 2 claims can be inferred[35]

---

**33.** "Other than Rule 9, which governs a limited number of particular matters, there are no special pleading provisions in the Federal Rules." 5 Wright & Miller, *Federal Practice and Procedure, Civil 2d* § 1221. The *Nagler* opinion, reversing dismissal of an antitrust case for failure to state a claim, was written by Chief Judge Charles E. Clark, the principal draftsman of the Federal Rules of Civil Procedure. He noted, "When the rules were adopted there was considerable pressure for separate provisions in [certain] special types of litigation. Such arguments did not prevail; instead there was adopted a uniform system for all cases[.]" *Nagler v. Admiral Corp.*, 248 F.2d 319, 322–23 (2d Cir.1957); 5 Wright & Miller § 1221.

**34.** Defendants' reliance on *Heart Disease Research Foundation v. General Motors Corp.*, 463 F.2d 98 (2d Cir.1972), dismissing a poorly plead antitrust claim, is misplaced. As Judge Lasker noted in *Minpeco, S.A. v. Conticommodity Services Inc.*, 552 F.Supp. 327, 331 (S.D.N.Y.1982), "The complaint in *Heart Disease Research* was described by the Court of Appeals as 'sloppy,' 'scattershot' and 'frivolously drawn.' ... Moreover, the *Heart* court did not rule that the facts alleged in support of the conspiracy claim were insufficient; it stated that 'no facts [were] alleged.' (emphasis added)." Similarly, the cases from other circuits cited by defendants are inapposite. In *Mountain View Pharmacy v. Abbott Labs*, 630 F.2d 1383, 1385 (10th Cir.1980), the complaint merely "used statutory language to describe the alleged antitrust violations without including any factual allegations whatsoever". In *Lombard's, Inc. v. Prince Manufacturing, Inc.*, 753 F.2d 974, 975 (11th Cir.1985), *cert. denied*, 474 U.S. 1082, 106 S.Ct. 851, 88 L.Ed.2d 892 (1986), the antitrust allegations were merely conclusory. In *Vermilion Foam Products Co. v. General Electric Co.*, 386 F.Supp. 255, 257–59 (E.D.Mich.1974), the complaint "which ramble[d] over a series of related and unrelated events," contained a dearth of allegations to support the antitrust claim.

**35.** In contrast, the thin allegations in the complaint fall far short of the evidence that is needed to prove an antitrust violation. *See, e.g., Venture Technology v. National Fuel Gas Co.*, 685 F.2d 41, 45–46 (2d Cir.) (attendance at meetings and the opportunity to conspire are insufficient to prove conspiracy), *cert. denied* 459 U.S. 1007, 103 S.Ct. 362, 74 L.Ed.2d 398 (1982); *cf. Hunt v.*

and constitute adequate notice to the defendants.[36] The discovery process and other pre-trial procedures will provide "whatever additional sharpening of the issues is necessary." *George C. Frey Ready–Mixed Concrete,* 554 F.2d at 554 (2d Cir.1977); *See* Rules 12(e), 16 26–35, and 56, F.R.Civ.P.

Nevertheless, since plaintiffs have not connected the Caxton defendants to the Relevant May Markets or the Soros defendants to the Relevant April Markets, the Caxton and Soros defendants' motions to dismiss are granted as to the antitrust claims involving the Relevant May and April Markets, respectively.

## V *Intentional Infliction of Emotional Distress Claim*

The Caxton and Steinhardt defendants move to dismiss plaintiff Hauptfuhrer's intentional infliction of emotional distress claim on the grounds that plaintiffs fail to allege either the "outrageous conduct" or the "specific intent" elements of that offense. Plaintiffs add credence to defendants' contentions because their opposition brief did not even attempt to refute the defendants' attacks on this claim.

▮ Plaintiff Hauptfuhrer alleges as "outrageous" conduct defendants' "manipulating the Treasury market". Complaint ¶ 188. New York, which uses the Restatement 2(d) of Torts definition of intentional infliction of emotional distress, requires that the alleged conduct be "so outrageous in character, and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Martin v. Citibank, N.A.,* 762 F.2d 212, 220 (2d Cir.1985) (quoting *Fischer v. Maloney,* 43 N.Y.2d 553, 558, 402 N.Y.S.2d 991, 373 N.E.2d 1215 (1978)). New York courts have been very strict in applying this principle. *Id.* While deception and fraud associated with the purchase and sale of securities and commodities can create emotional distress and may be hurtful to the economy, manipulation of a market without more is not conduct which satisfies this strict standard for "outrageous" conduct. *See, Kimmel v. Peterson,* 565 F.Supp. 476, 499 (E.D.Pa.1983) (complaint alleging securities fraud insufficient to state cause of action for negligent or intentional infliction of emotional distress).

▮ In addition, plaintiff Hauptfuhrer did not plead intent sufficiently. Under New York law, the conduct alleged must be "intentionally directed at the plaintiff and lack any reasonable justification." *Id.; see also, Green v. Leibowitz,* 118 A.D.2d 756, 500 N.Y.S.2d 146 (2d Dept 1986) ("gravamen of a cause of action for intentional infliction of emotional distress is that the conduct complained of 'is especially calculated to cause, and does cause, mental distress of a very serious kind' "). Although the complaint states that defendants "engaged in extreme and outrageous conduct with intent to cause plaintiff Hauptfuhrer to suffer emotional distress," manipulation of a market by its very nature is not aimed at any particular individ-

*Mobil Oil Co.,* 465 F.Supp. 195, 230–231 (S.D.N.Y.1978) (Weinfeld, J.), *aff'd without op.,* 610 F.2d 806 (2d Cir.1979). *See also Theatre Enterprises v. Paramount Film Distributing Corp.,* 346 U.S. 537, 541, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954) (circumstantial evidence of parallel behavior is not enough to demonstrate conspiracy for the purposes of the Sherman Act); *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).

**36.** The Caxton defendants also claim that the alleged injury to plaintiffs is not of the type the antitrust laws were designed to protect against because plaintiffs do not allege an injury to anyone but themselves. Injury to one competitor does not constitute "restraint of trade." *Telectronics Proprietary, Ltd. v. Medtronic, Inc.,* 687 F.Supp. at 837, 838 n. 9. The complaint does, however, allege injury to other "short" investors

¶ 69, and, in any event, the complaint clearly supports the inference that defendants caused "antitrust injury" to overall competition in the Relevant Markets. *Id.*

The court is also not persuaded by Caxton's argument that the antitrust allegations, even if true, do not render Kovner or Luttrell liable as participants. Caxton relies on *New York v. Dairylea Coop. Inc.,* 570 F.Supp. 1213, 1216 (S.D.N.Y.1983) (Owen, J.); however that complaint, which was adequately pleaded as to the corporate defendants, merely recited as to the individuals their type of employment with the defendant corporations, their home addresses and nothing more. In the present case, Kovner and Luttrell purportedly convened and played a key role in the meeting at which the alleged conspiracy was fomented. These allegations will suffice to survive a motion to dismiss.

ual, and is calculated to cause profits for the manipulators as opposed to emotional distress for particular individuals. Complaint ¶ 188.[37]

For the foregoing reasons, plaintiff Hauptfuhrer's intentional infliction of emotional distress claim is dismissed.

## VI *Common Law Fraud Claim*

Plaintiffs assert a common law fraud claim alleging that the defendants actively concealed or intentionally failed to disclose to both plaintiffs and the Treasury market material facts relating to defendants' manipulative activities, with intent to defraud both plaintiffs and the Treasury market. Complaint ¶ 175–179.

 Arguing that they had no duty to disclose the alleged manipulation to the plaintiffs, the Steinhardt and Soros defendants move to dismiss this claim pursuant to Rule 12(b)(6), F.R.Civ.P.. The defendants rely on case law which holds that under New York law, where a claim of common law fraud is based upon nondisclosure or concealment as opposed to actual misrepresentation, there must be shown "an obligation to disclose arising from some fiduciary or confidential relationship." *Coface v. Optique du Monde, Ltd.,* 521 F.Supp. 500, 504 (S.D.N.Y. 1980) (Conner, J.); *see also, Metropolitan Securities v. Occidental Petroleum,* 705 F.Supp. 134, 141 (S.D.N.Y.1989) (Sweet, J.). Were this the full extent of applicable law, a motion to dismiss would be appropriate since the complaint does not allege any fiduciary duty or confidential relationship between the defendants and plaintiffs. However, the plaintiffs correctly point out that where defendants are accused of creating an "artificial market" or a "price mirage," defendants have a duty to disclose regardless of whether they have a fiduciary or confidential relationship with plaintiffs. *See, Minpeco, S.A. v. Conti-*

*commodity Services, Inc.,* 552 F.Supp. 332, 336–338 (S.D.N.Y.1982) (Lasker, J.). Since plaintiffs are alleging that defendants created artificial market conditions by causing a "squeeze," plaintiffs do not have to allege the existence of a fiduciary or confidential relationship in order to charge defendants with failure to disclose.[38] Thus, the defendants' motion to dismiss pursuant to Rule 12(b)(6), F.R.Civ.P., is denied.

The Steinhardt, Soros and Caxton defendants are correct, however, in their contention that the complaint fails to comply with the requirements of Rule 9(b), F.R.Civ.P.. Rule 9(b) applies to common law fraud claims. *See Hutton v. Klabal,* 726 F.Supp. 67, 70–71 (S.D.N.Y.1989) (Broderick, J.) (where allegations of common law fraud are founded on information and belief, and no facts or events are pleaded to support such a claim, dismissal required) (Broderick, J.); *Raffaele v. Designers Break, Inc.,* 750 F.Supp. 611, 613 (S.D.N.Y.1990) (Carter, J.).

To prove that their common law fraud claim is sufficiently particularized, plaintiffs rely on the same six "factual predicates" which they argued demonstrated a "strong inference" of § 10(b) securities fraud. However, plaintiffs' common law fraud claim suffers the same defect as plaintiffs' § 10(b) claim: plaintiffs fail to set forth a particularized basis from which an inference of fraud might fairly be inferred.

## VII *Service of Process*

Defendant George Soros moves to dismiss the entire action against him pursuant to Rule 12(b)(5), F.R.Civ.P., because the plaintiffs failed to serve process on him in accordance with the requirements of Rule 4, F.R.Civ.P.

 Objections to sufficiency of process must be specific and point out the manner in

---

37. Plaintiff Hauptfuhrer also alleges that the defendants manipulated the Treasury market "with reckless disregard for the fact that their conduct would cause him to suffer severe emotional distress." However, New York does not permit recovery for emotional distress inflicted recklessly but not intentionally. *Garland v. Herrin,* 724 F.2d 16, 21 (2d Cir.1983).

38. In their Rule 12(b)(6) motion to dismiss plaintiffs' common law fraud claim, the Caxton defendants argue that the complaint does not properly allege that their conduct was the proximate cause of plaintiffs' loss. Caxton's argument is based upon the same reasoning which the court rejected in the above consideration of Caxton's motion to dismiss the Securities Exchange Act claim; there is no need to repeat that discussion here.

which plaintiff has failed to satisfy requirements of the service provision utilized. *King v. Best Western Country Inn*, 138 F.R.D. 39, 43 (S.D.N.Y.1991) (Haight, J.) (citing *Photolab Corp. v. Simplex Specialty Co.*, 806 F.2d 807 (8th Cir.1986)). Despite this requirement, defendant Soros did not provide any detail as to how plaintiffs failed to satisfy the requirements of Rule 4 until his reply brief. Therefore, the plaintiffs were forced to respond to the defendant's accusation by affidavit and letter.

According to defendant Soros, although the plaintiffs purported to serve Soros pursuant to Rule 4(c)(2)(C)(i), F.R.Civ.P., which allows process in a federal action to be served by a method approved by the law of the state in which the federal court sits, the plaintiffs did not satisfy the requirements of N.Y.C.P.L.R. 308(2). Indeed, plaintiffs' Affidavit of Service by Fredric Salzberg states that Salzberg served the summons and complaint "pursuant to F.R.Civ.P. § 4(c)(2)(C)(i) and CPLR § 308.2...." Affidavit of Frederic E. Salzberg, attached to Affidavit of Kenneth I. Schacter, Esq. as Exhibit F, submitted with plaintiffs' Omnibus Memorandum of Law.

Pursuant to CPLR § 308(2) personal service may be made by: (1) delivering the summons within the state to a person of suitable age and discretion at the dwelling place of the person to be served; and (2) by mailing the summons to the person to be served at his last known residence in an envelope bearing the legend "personal and confidential" and not indicating on the outside thereof that the communication is from an attorney or concerns an action against the person to be served; and (3) such delivery and mailing must be effected within twenty days of each other; and (4) proof of such service shall be filed with the clerk of the court designated in the summons within twenty days of either such delivery or mailing, whichever is effected later. Service shall be complete ten days after such filing.

Defendant Soros contends that plaintiffs did not satisfy the fourth requirement of CPLR § 308(2) because proof of service was not filed with the clerk of the court within twenty days of mailing or delivery. According to the Salzberg affidavit, the summons and First Amended Complaint were delivered on August 14, 1992 and were mailed on August 17, 1992, but the court's docket sheet, annexed as Exhibit A to defendant Soros' Affidavit of Gerald Kerner, shows that proof of service was not filed until November 9, 1992, well past the twenty day limit.

 Once the validity of service of process has been contested, the plaintiffs bear the burden of establishing its validity. *Lee v. Carlson*, 645 F.Supp. 1430, 1432 (S.D.N.Y.1986) (Weinfeld, J.), *aff'd without op.*, 812 F.2d 712; *King*, 138 F.R.D. at 43. The plaintiffs respond by letter dated December 14, 1992 that Salzberg's assertion in the Affidavit of Service that service was made pursuant to Rule 4(c)(2)(C)(i) and CPLR § 308(2) was mistaken. According to plaintiffs Salzberg's mistake "cannot negate the undisputed fact that service was, in fact, made under Rule 4(d)(1)." [39]

Ordinarily in such a case insufficient service of process will be quashed and the action preserved, provided there is a reasonable prospect that plaintiff ultimately will be able to serve the defendant properly. *See Montalbano v. Easco Hand Tools, Inc.*, 766 F.2d 737, 740 (2d Cir.1985); *Securities & Exchange Commission v. Gilbert*, 82 F.R.D. 723, 727 (S.D.N.Y.1979) (Lasker, J.). In this case, plaintiffs in essence assert that they have already corrected insufficient service pursuant to Rule 4(c)(2)(C)(i) by serving Soros in accordance with the requirements of a

---

**39.** Consideration of the purpose of Rule 4(c)(2)(C)(i), F.R.Civ.P., supports plaintiffs' contention that Salzberg was mistaken as to the provision of Rule 4 by which defendant Soros was served. Rule 4(c)(2)(C)(i), F.R.Civ.P. is designed to enable federal courts to take advantage of state long-arm statutes which commonly permit personal service without the state in a variety of instances in which defendant has had some contact with the state. 4 Wright & Miller, Federal Practice and Procedure: Civil 2d, § 1112, at 229 (1987). Salzberg states in the Affidavit of Service that he delivered the summons and First Amended Complaint to Soros' Manhattan residence. As this court is also within New York State, plaintiffs clearly had no need for service without New York State with respect to Soros. Thus, plaintiffs had no reason to rely on the more cumbersome service requirements of Rule 4(c)(2)(C)(i), F.R.Civ.P., and CPLR § 308(2).

different provision of Rule 4. Plaintiffs should be able to correct a reference to the wrong provision of Rule 4, F.R.Civ.P., provided they can prove that service satisfied the requirements of the provision on which they rely and was completed within 120 days after filing the complaint as required by Rule 4(j), F.R.Civ.P. Since the complaint was filed on June 3, 1992 and delivery of the summons and complaint to Soros was complete on August 14, 1992, 72 days after filing of the complaint, the plaintiffs have satisfied the service of process requirements of Rule 4(d)(1), F.R.Civ.P., and Rule 4(j), F.R.Civ.P..

Under Rule 4(d)(1), F.R.Civ.P., service may be made "[u]pon an individual other than an infant or an incompetent person, by delivering a copy of the summons and the complaint to the individual personally or by leaving copies thereof at the individual's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein...." Thus, unlike CPLR § 308(2), Rule 4(d)(1) contains no mailing or filing requirement. The Salzberg affidavit, despite its reference to Rule 4(c)(2)(C)(i), F.R.Civ.P., contains sufficient details from which to conclude that service was effected pursuant to Rule 4(d)(1), F.R.Civ.P. The affidavit states that Salzberg delivered a true copy of the summons and complaint to Soros' doorman who was of "suitable age and discretion," and was described as approximately 20 years old. Thus, defendant Soros' motion to dismiss for insufficient service of process is denied.

## Conclusion

For the foregoing reasons, the defendants' motions are granted in part and denied in part. Since plaintiffs have demonstrated a likelihood that they will be able to cure some of the deficiencies in their Securities Exchange Act and common law fraud claims, their RICO claims as to the Steinhardt defendants, and their Sherman Act and RICO claims three, four, and five as to the Soros defendants, plaintiffs are given until March 19, 1993, to further amend their complaint as to those claims. Based on this decision and the commonalities between this action and related litigation presently before Judge Robert P. Patterson, defendant Salomon Brothers' application to transfer and consolidate this action before Judge Patterson pursuant to Rule 15, Southern District of New York Rules for the Division of Business Among District Judges, is granted.

**IT IS SO ORDERED.**